## BENTLEY et al. v. ZELMA OIL CO. et al.

No. 9060.—Opinion Filed June 17, 1919.

Rehearing Denied Oct. 7, 1919.

(Syllabus by the Court.)

**1. Corporations—Officers—Corporate Property—Personal Advantage.**

Directors and officers of a corporation, having the management of its corporate affairs, occupy the position of trustees of the welfare of the company, and guardians of the interests of the stockholders, and will not be permitted by a court of equity to violate such trust, by selling or purchasing the corporate property to their own personal advantage and to the detriment of their cestuis que trust.

**2. Same.**

The law is averse to sale of corporate property to directors and officers intrusted with the making of such sales, and courts of equity look with suspicion upon them, and will sustain them only upon clear proof of good faith and adequacy of consideration.

**3. Same—Contracts—Interlocking Directorates.**

A contract between two corporations, effected by votes of directors common to both, is presumptively invalid, and can only be sustained by an affirmative showing of fairness and good faith.

**4. Same—Vacation of Sale of Property.**

Where the president of a corporation makes a sale of corporate property, either real or personal, in violation of the by-laws of the company, or in violation of a resolution adopted by the board of directors, and such sale is for an inadequate consideration, it will be set aside in an action by dissenting stockholders, where the board of directors refuse to bring suit.

**5. Same.**

A conveyance of an interest in an oil and gas lease on land is a conveyance affecting real estate, within the provisions of our statutes, and where the instrument of such conveyance is not under the seal of the corporation, nor attested by the secretary thereof, as required by section 1187, Rev. Laws 1910, and is not acknowledged in substantial compliance with section 1188, such conveyance is invalid, and subsequent purchasers are charged with notice of its invalidity, and such conveyance may be set aside by dissenting stockholders defrauded thereby, where the directors refuse to bring suit.

**6. Corporations—Fictitious Stock—Constitutional Law.**

Under section 39, art. 9, of the Constitution, of Oklahoma, as construed in Lee v. Cameron, 67 Oklahoma, 169 Pac. 17, all stock of a corporation issued as fully paid up, when in fact the par value of such stock

has not been paid into the corporation in money or money's worth, is fictitious and void.

**7. Same—Voting Fictitious Stock—Sales—Validity.**

Stock which is fictitious and void under section 39, art. 9, of the Constitution, cannot be counted and voted against stock for which the par value in cash, or its equivalent, has been paid, in order to obtain a majority in voting on a proposition to sell the property of the corporation, and a sale authorized by a majority composed of such stock may be set aside by dissenting holders of valid stock.

**8. Appeal and Error—Presenting Questions in Trial Court—Champertous Contract.**

The question whether a contract of employment between plaintiffs and their attorney is champertous cannot be raised for the first time here.

**9. Corporations—Fraudulent Sale to Another Corporation — Fraud—Innocent Purchasers.**

Where one corporation has made a fraudulent sale of its property to another corporation, and the stockholders of the "one corporation" bring an action to set aside such fraudulent sale, in such case the stockholders of the "other corporation," who have purchased their stock before the property of the "one corporation" was purchased, are not innocent purchasers.

**10. Same—Oil Lease—Accounting for Expenditures and Profits.**

It appearing that the officers of the Zelma Company made a fraudulent sale of a lease to the Nemo Company, and that afterwards the Nemo Company expended money in developing such lease, but it appearing that in the meantime certain amounts of profits which rightfully belonged to the Zelma Company had been received and appropriated by the Nemo Company, in such case a proper accounting should be had, and the rights of the parties determined thereby.

**11. Same—Suit by Dissenting Stockholders to Cancel Fraudulent Conveyance.**

Where the officers and directors of a corporation refuse to bring suit to cancel conveyances of corporate property, fraudulently made by such officers and directors, dissenting stockholders in such case may maintain an action for the cancellation of such conveyance.

Error from District Court, Tulsa County; Conn Linn, Judge.

Suit by W. C. Bentley and others against the Zelma Oil Company, the Almez Oil Company, the Nemo Oil Company, and .H. B. Houghton, president of such corporations and trustee for some one or more of them. Judgment for defendants, and plaintiffs bring error. Reversed, with instructions to order a proper accounting by defendant Zelma Oil Company, and to render judgment in accordance with conclusions of opinion.

Solon W. Smith, McGuire & Devereux, and Ames, Chambers, Lowe & Richardson, for plaintiffs in error.

Everest, Vaught & Brewer and Everest & Campbell, for defendant in error Zelma Oil Company.

Cottingham & Hayes, Poe & Lundy, and Ringolsky & Friedman, for defendant in error Nemo Oil Company.

HARRISON, J. W. C. Bentley and 13 other minority stockholders of the Zelma Oil Company brought this suit against the Zelma Oil Company, the Almez Oil Company, the Nemo Oil Company, separate corporations, and H. B. Houghton, president and manager of all of said corporations, and trustee for some one or more of same; the object of the suit being to cancel a certain well-drilling contract and certain assignments for fraud. The well-drilling contract was made between H. B. Houghton, as president of the Zelma Oil Company, and one Max Moore; the assignments in question being of a lease belonging to the Zelma Oil Company, and assigned by George Houghton, as vice president of the Zelma Oil Company, to H. B. Houghton, trustee, thence by H. B. Houghton to the Almez Oil Company, and thence by H. B. Houghton to the Nemo Oil Company—the Nemo Oil Company claiming said lease at the time this suit was brought.

The primary grounds for the suit were fraud; the primary purpose was the cancellation of the instruments in question; hence the right to cancellation depended upon the evidence of fraud. The transactions out of which the case grew and upon which plaintiffs relied for evidence of fraud were as follows:

Prior to June 3, 1913, there was a scope of territory, near the town of Newcastle, in McClain county, which was worthless for oil and gas purposes, and designated as "wildcat" territory, and upon which oil and gas leases were obtainable for comparatively nothing, viz., $1 each, notary and recording fees. On June 3, 1913, H. B. Houghton, his brother, George Houghton, W. M. Sawyers, and J. M. Hamilton organized the Zelma Oil Company, capital stock $50,000, shares $1 each. On the next day, June 4th, said parties, being the directors named in the articles of incorporation, held a directors' meeting, at which by-laws were adopted and the following persons unanimously elected, viz: H. B. Houghton, president; George

Houghton, vice president; and W. M. Sawyers, secretary. The articles of incorporation provided for four directors; but they adopted by-laws providing for only three, and then elected five, viz.: H. B. Houghton, George Houghton, W. M. Sawyers, J. M. Hamilton, and J. E. Wright.

Now it developed that these directors had come into possession of a number of leases in said "wild-cat" territory, and on June 10th they held another meeting, at which it was concluded unanimously that it was to the best interest of the Zelma Oil Company to own all these "wild-cat" leases, whereupon it was resolved unanimously that the Zelma Oil Company purchase said "wild-cat" leases from said directors and issue to them 26,000 shares of its stock as fully paid up and non-assessable. Said resolution being substantially followed out, they thus became majority stockholders without paying any money for their stock—it appearing from the record that these same directors caused themselves to be reimbursed by the Zelma Oil Company for all the expense they had incurred in procuring said "wild-cat" leases, viz.: $1 each, notary and recording fees; also their hotel bills, traveling expenses, etc., while so engaged. Having thus acquired a controlling interest, these directors resolved that the company should borrow $3,000 with which to begin drilling. This being done, they unanimously recognized the necessity of at once starting a stock-selling campaign, which they did, selling to yeomen, artisans, clerks, stenographers, etc., in various counties of the state at $1 a share, par value, cash.

But, while this class of subscribers, among whom were plaintiffs herein and 41 others, were required to and did pay the par value in cash for all the stock they purchased, about 4,257 shares, there were others to whom stock was sold at much better figures. H. L. Houghton, a brother of President Houghton and Vice President Houghton, was issued 3,000 shares for $1,000, G. R. Witmer, a friend of the brother of President Houghton and Vice President Houghton, was issued 4,000 shares for $1,750, Mrs. H. L. Houghton, wife of the brother of President Houghton and Vice President Houghton, was issued 100 shares, Mrs. George Houghton, wife of Vice President Houghton, and Mrs. A. H. Hanson, were each issued 100 shares, and Mrs. H. B. Houghton, wife of President Houghton, was issued 500 shares, making in all 800 shares, for which nothing was paid.

On June 20, 1913, President Houghton and Vice President Houghton, assuming to act for the Zelma Oil Company, entered into a contract with the original lessors of McClain county, whereby all of said wild-cat leases were purchased over again; that is to say, the Zelma Oil Company, through its directors, first bought said wild-cat leases from the directors, paying them just what the leases had cost them, together with their expenses in procuring same, and in addition issuing them 26,000 shares of stock; and, secondly, through its president and vice president the Zelma Oil Company again bought the same wild-cat leases from the original lessors, paying the lessors $1 each and the notary and recording fees.

In said contract—that is, the one whereby the Zelma Oil Company bought said leases the last time—it was provided that the company should drill a well somewhere on said leases, and that the lessors should place the leases in escrow in a bank, and the company should place a bond for $2,500 in the bank, the leases to be turned over to the company when it got all the drilling equipment on the ground and began drilling, and the bank to turn over the $2,500 bond to lessors if the company failed to drill 2,000 feet, or failed to strike oil or gas at a lesser depth. The contract provided, also, that if drilling be abandoned for three years at any one time the leases should become void, and it may be observed 'at this point that the well was never drilled to a depth of 2,000 feet nor was oil or gas struck at a lesser depth, and that the leases ultimately expired and passed away quite naturally. However, on August 13, 1913, at a directors' meeting the minutes of which purport to show a quorum present, Vice President Houghton in the chair, a proposition of Eaton & Morgan, a drilling firm, to drill a well 2,000 feet deep, was accepted, and on September 9, 1913, a contract purporting to be between the Zelma Oil Company and G. C. Eaton and A. R. Morgan was entered into between Eaton and Morgan, of the first part, and George Houghton, W. M. Sawyers, and J. M. Hamilton, of the second part. Said contract was not signed by the president of the Zelma Oil Company, nor attested by the secretary of the Zelma Oil Company, nor under the seal of the Zelma Oil Company, nor was the name of the Zelma Oil Company subscribed to said contract. It was signed simply by G. C. Eaton and A. R. Morgan, parties of the first part, and Geo. Houghton, W. M. Sawyers, and J. M. Hamilton, parties of the second part. It provided, however, that the Zelma Oil Company would pay Eaton & Morgan $5,000 and issue them 1,000 shares of paid-up nonassessable stock for drilling a well 2,000 feet deep, unless oil or gas in paying quantities be struck at a lesser depth. The well was never drilled

2,000 feet, nor was oil or gas found at a lesser depth; but Eaton & Morgan were paid $2,250 of the bona fide stockholders' money in this contract, and, being desirous of getting the balance, $2,750, Morgan, who owned an 80-acre lease in what was known as the "Bixby field," in Tulsa county, made a new contract with the Zelma Oil Company, whereby he agreed to assign his 80-acre lease in the Bixby field to the Zelma Oil Company and drill a well on said lease 1,750 feet deep for the balance due under the other drilling contract. So on March 20, 1914, the following letter was sent out to the stockholders:

"H. B. Houghton,    W. M. Sawyers,
"President.                        Secretary
"Zelma Oil Company.
"Capital Stock, $50,000.00, Fully Paid and Non-assessable.
"306-7-8 American National Bank Building.
"Oklahoma City, Okla., 3/20/14.
"Stockholders of the Zelma Oil Company:

"We believe that the stockholders of the Zelma Oil Co., are entitled to all the information that is obtainable in regards to the work done by our company; also our future intentions.

"We began work on Sept. 20, 1913, and have been drilling continuously, day and night, since the above date. We encountered red beds after the first 200 feet. At 1,020 feet we struck a broken formation and 12 feet of oil sand, with a nice showing of oil. Directly under this we struck a large volume of salt water, which we cased off. From 1,032 to 1,415 feet we encountered red beds and veins of water. At 1,415 our driller could go no further. Our expert, who has been at the well continuously during the last 1,000 feet, advised us that it would be impossible to go any deeper.

"We have acquired an 80-acre tract in sec. 20—17—13, east of the Glen Pool in the proven oil field of the state, and we are proceeding to at once drill a well on the above tract. We are pulling our casing from the first hole and expect to be in full operation in the proven field within ten days.

"This gives every stockholder an interest in a well being drilled in the proven fields. Just 1 3-4 miles from our 80-acre lease a well was brought in during the past ten days making 1,800 barrels per day. Other wells are coming in there from 200 to 600 barrels per day. We are going to complete a well there at a deep depth. If we are successful and strike a well, our intentions are to drill another well on our 8,000 acres of leases we are now moving off of.

"We would be pleased to have any stockholder who desires further information to write us direct and we will give their letters prompt attention.    By Order of Directors."

At this time, March 20, 1914, the company had been organized something over nine months; its president and directors had invested nothing in the company; they had bought the McClain county wild-cat leases twice, and paid for them both times out of money paid in by the bona fide subscribers, and in addition had issued to themselves and their friends a controlling interest in the company's stock. They had paid $2,250 of the bona fide stockholders' money in a pretense of drilling a well on the wild-cat leases, and at this time had contracted to spend $2,750 more and to issue 1,000 more shares for drilling on the newly acquired lease, which lease it may be observed had been bought with the bona fide stockholders' money, and was all that the company owned at this time that held out even a promise of value for their money, and is the lease in controversy here. Hence the significance of the above letter.

The contract with Morgan provided that Morgan should drill at a point to be designated by President Houghton. President Houghton designated the point, and Morgan began drilling. Now it happened that the Gladys Belle Oil Company had a lease adjoining the Zelma Company lease, and that the point designated for drilling by President Houghton was 140 feet from the line of the Gladys Belle Oil Company, and it subsequently developed that the Gladys Belle Oil Company gave President Houghton 40 acres of its lease for locating the Zelma well at this point, thereby developing the Gladys Belle property. President Houghton took the 40-acre lease in his own name, instead of in his company's name.

On May 8, 1914, Morgan struck oil on the new lease at a depth of 1,668 feet, flowing 40 barrels per day. President Houghton was present on the night the oil was struck, and returned that night to Oklahoma City, saying he was going back to buy more stock before the stockholders heard of the strike. On the next day he bought 100 or more shares, and Vice President Houghton bought about 50 shares. It does not appear that the rest of the directors knew anything of this strike, except Sawyers, the secretary. He and President Houghton and Vice President Houghton held a meeting the next day and reported to each other.

So, on May 23, 1914, another significant letter was addressed to a portion of the stockholders, saying in substance that they had struck paying oil at 1,668 feet, that it was flowing 40 barrels per day, that experts had informed them that a large well could be struck by drilling to deep sand, that they were going to drill to deep sand, that another well just south of theirs was flowing

1,600 barrels per day, and that "financially we are in good shape." A few days after the date of the above letter, assuring the stockholders that "financially we are in good shape," to wit, on June 10, 1914, a meeting was held by four directors, viz., Sawyers, Wright, and the two Houghtons, at which it was resolved that the company owed $5,-586.21, and that it had $425.52 in the bank, and further resolved that the officers of the company be authorized to obtain a loan from the American National Bank and to assign the Zelma lease as security therefor. Subsequently a loan of $6,300 was obtained from said bank upon a note signed by the Zelma Company and eight stockholders, H. B. Houghton, George Houghton, H. L. Houghton, J. H. Everest, J. S. Twyford, W. M. Shaver, J. E. Wright, and W. M. Sawyers. It may be observed here that the by-laws of the Zelma Oil Company provided that—

"An annual meeting of the stockholders shall be held on the first Monday in June of each year, at which the president shall submit a complete report of the company's operations and the state of its corporate affairs for the year."

No such meeting was held or called, and the bona fide stockholders were in total ignorance of all of the above transactions. The above-mentioned loan, however, was obtained in July, 1914; hence on that date the company owned the 80-acre lease in the Bixby field, owned a "standard drilling rig," for which it had paid $1,000, and should have had nearly $7,000 in the treasury, the $6,-300 obtained on the aforesaid loan and the $425 resolved to be in the bank at the meeting of June 10th, aforesaid, and had a well which on May 23d was flowing 40 barrels per day, and according to said letter of May 23d had a very bright prospect for striking a great well, and was "financially in good shape;" yet no further developments were made, no further efforts to drill another well for more than a year thereafter, although Morgan had moved over just 300 feet upon a lease of his own and drilled a well which flowed 50 barrels per day, and notwithstanding the owners of the land covered by the Zelma lease were complaining and insisting that drilling be resumed.

In the meantime the date for holding the annual meeting, the first Monday in June, had passed again without any meeting, and without the bona fide stockholders having any knowledge whatever of the condition of the company's affairs. But in July, 1915, President Houghton went to R. L. Cummings, who owned 40 acres of land covered by the Zelma Company's lease, and told Cummings that he (President Houghton) had plenty of

money with which to develop the lease and would drill on Cummings' 40, if Cummings would give him some acreage or pay him $300; otherwise, he would drill elsewhere. Cummings declined to give the acreage or pay the $300. The well was not drilled on Cummings' 40.

But on August 12, 1915, President Houghton entered into a contract with one Max Moore, whereby a one-half interest in the Zelma Company's lease and all other property owned by the Zelma Company was assigned to Max Moore, for which Moore was to drill to a depth of 2,100 feet, unless oil or gas be struck in paying quantities at a lesser depth. The contract also provided that Moore was to do some work on the well already drilled, but was to be the judge of what work was to be done. It does not appear from the contract what work was to be done, nor from the record that any was ever done, except that Morgan hired another man, Robbins, to pull some casing, for which he never paid Robbins, and Robbins filed a lien against the company for $400 for the work, nor did Moore ever drill the well, but the one-half interest assigned to him ultimately turned up in President Houghton's name. This is the drilling contract which the plaintiffs herein seek to have canceled. It was not under the seal of the corporation, nor attested by the secretary thereof, was made without the knowledge or consent of any bona fide stockholders, and against the advice of the company's attorney, and in violation of law and the resolution adopted by the directors on May 9, 1914, which provided:

"Any contract for drilling new wells to be approved by the board of directors."

On August 26, 1915, W. M. Sawyers resigned as secretary; his resignation was in writing and pasted in the minute book of the company. It shows that he resigned as secretary only. Sawyers said that he resigned as secretary only, and not as both secretary and director, President Houghton said that Sawyers resigned as both secretary and director; but the written resignation was only as secretary, and President Houghton admitted that he altered the written resignation, so as to make it show both director and secretary, after this suit was brought, and after a writ of duces tecum had been served upon him, commanding him to bring the books of the company into court.

On December 21, 1915, President Houghton, Vice President Houghton, and Director J. E. Wright met in the company's office for the purpose of discussing ways and means. At this time they owed the American Nation-

al Bank $6,300, and owed some other bills, aggregating several hundred dollars, though nothing had been done on the lease since the 40-barrel well had been brought in on May 8, 1914, except to shoot this well into salt water and ruin it. Nothing had happened to diminish the value of the lease since May 23, 1914, nothing was left of the money which President Houghton told Cummings he had in July, 1915, and nothing to show for the $6,300 borrowed from the American National Bank; yet it was necessary to provide ways and means, and in order to provide ways and means it was deemed necessary to call some kind of a meeting of stockholders. The by-laws provided that a majority of the directors could request the president to call a meeting of the stockholders. There was not a majority present at this meeting, so President Houghton told Vice President Houghton to get Shaver to sign it. Shaver was not a director. But President Houghton told Vice President Houghton that a stockholder could sign it, whereupon Vice President Houghton, Director Wright, and Stockholder Shaver signed a request to President Houghton to call a special stockholders' meeting for the purpose of devising ways and means. Upon such request President Houghton prepared a notice for a special stockholders' meeting to be held in the company's office, 506 American National Bank Building, on December 31, 1915. Though these notices purported to have been issued December 21st, they were in fact not mailed out at all but a few of the stockholders, and too late for any but a very few of those who did receive them to attend.

However, on December 31st the directors and a few of the stockholders met in the American National Bank Building, but the meeting was not called to order and no business was transacted. An understanding was reached among a few of the managers that the meeting would be adjourned to a later date, January 7th, but only a few of the manipulators knew anything of the meeting to be held on January 7th, and no one knew where it was to be held. No further notice was given the stockholders in reference to such meeting, but on January 7th, a meeting was held, the minutes of which show to have been held in the Colcord Building. A resolution was passed at such meeting directing their officers and directors to make a sale of all the company's property and then give notice of such sale to the stockholders.

On January 13th a report of the meetings of December 31st and January 7th it is claimed was mailed out to a few of the stockholders. There were about 50 stockholders—in fact, nearly all of the bona fide stockholders—who never received such notice and never heard of such meeting until this suit was brought. Said report to the stockholders, dated January 7, 1916, is in part as follows:

"You are hereby notified that at a meeting of the stockholders, lawfully called, and at which a legal quorum was present, the original meeting being called for the 31st day of December, 1915, and which meeting was by a majority of those present adjourned to the 7th day of January, 1916, held at the office of the company in Oklahoma City, Oklahoma, that it was unanimously resolved to sell the leases of the Zelma Oil Company held near Bixby, Oklahoma, and the other property of the company situated thereon, upon due advertisement to be made by the directors and at either public or private sale for the best sum obtainable. * * *

"As a part of the same resolution, it was suggested by a number of the stockholders present that a new company be formed to purchase the leasehold interests and develop these leases, and it was moved that every stockholder in the old Zelma Oil Company be given an opportunity to purchase the same proportion of stock in the new company that his stock in the old company bears to the paid-up stock in the old company.

"Looking toward the formation of a new company, and the taking over of the old company and developing it, provided the new company is successful in bidding in the property, a stock subscription has been started, a copy of which is inclosed herewith, and if you desire to subscribe for any stock in the new company to be formed in accordance with the subscription blank, sign and return the same to H. B. Houghton, Colcord Building, this city, being careful to write the amount of stock you wish to take in the new company opposite your name. If the new company is not successful in bidding on the leases of the old Zelma Oil Company, your stock subscription, of course, will be returned to you canceled. Otherwise, you will be called upon for payment.

"Yours truly,

"Zelma Oil Company, by ———."

The stock subscription blank referred to in the above notice is as follows:

"Subscription to Capital Stock.

"We, the undersigned persons, do hereby agree to associate ourselves together for the purpose of forming a private corporation under the laws of the state of Oklahoma, said corporation to be known as Zelma Oil Company No. 2, with its principal place of business at Oklahoma City, Oklahoma, for the purpose of acquiring and developing oil and gas, with the power of acquiring such real estate either by lease or purchase, as may be necessary or pertinent to said busi-

ness, and transacting such other business as may be connected with the development of oil and gas, with a capital stock of fifteen thousand dollars ($15,000), subdivided into fifteen thousand shares (15,000), of the par value of one dollar ($1) each. Said corporation is to exist for twenty years, and to have as its first directors, Harry B. Houghton, of Oklahoma City, Oklahoma; George Houghton, of Oklahoma City, Oklahoma; J. E. Wright, of Newcastle, Oklahoma; W. M. Shaver, of Oklahoma City, Oklahoma, and J. H. Everest, of Oklahoma City, Oklahoma, or such other persons as the stockholders may select. The specific intention and purpose of the organization of said company is to purchase, if possible, at either public or private sale, certain leases now owned and used by the Zelma Oil Company of Oklahoma City, near Bixby, Oklahoma, together with such personal property as there may be thereon.

"We agree to pay for said stock upon the issuance of a charter by the state of Oklahoma to the Zelma Oil Company No. 2, conditioned as above, fifty per cent. (50%) upon receiving notice of said incorporation, and the balance when the same may be directed by the board of directors.

| Name. | Residence. | No. of Shares. | Par Value." |
|---|---|---|---|

The Zelma Oil Company No. 2 was never organized; hence the above notice to the few stockholders who did receive it was misleading and false. But on February 1, 1916, President Houghton, of the Zelma Oil Company, organized the Nemo Oil Company and became its president. On February 20th the following notice of sale of the Zelma Company's property was published in the Tulsa World:

### "Oil and Gas Lease for Sale.

"Notice is hereby given that the Zelma Oil Company, a corporation, of Oklahoma City, Oklahoma, will receive written bids for the purchase of its leasehold interest, and all of its personal property, the said leasehold interest being upon the east one-half of the southeast quarter of section twenty (20), township seventeen (17) range thirteen (13), consisting of eighty acres more or less, in Tulsa county, state of Oklahoma, together with all the casing, pipes, tanks, and other material belonging to the Zelma Oil Company, now on said lease. The terms of said sale to be cash, and sealed bids will be received at the office of said company, No. 1117 Colcord Building, in Oklahoma City, Oklahoma, up to and including the 23d day of February, 1916, at the expiration of which time said property will be sold to the highest bidder for cash.

"The Zelma Oil Company,
"By H. B. Houghton, Its President."

It is observed from the record that the first publication of the foregoing notice was on February 20th, and that February 23d was the last day for receiving bids. None of the above notices were sent to any of the stockholders, but it appears from the record that the attention of one W. C. Elliott, an oil man of Tulsa, was called to said notice of sale, whereupon Mr. Elliott called up President Houghton over the telephone and asked President Houghton about said notice, with the view of filing a bid. President Houghton discouraged Mr. Elliott in filing a bid and gave him to understand that no bids were wanted. On February 24th President Houghton met Vice President Houghton. It does not appear clearly just where or when they met, nor conclusively that they met at all. But minutes of their meeting, which were dictated June 3d thereafter, purport to show that the following proceedings were had somewhere on February 24th, to wit:

### "Special Meeting.

"Now on this 24th day of February, 1916, a meeting of the board of directors of the Zelma Oil Company is held—being present H. B. Houghton and George Houghton.

"Thereupon bids are received as per advertisement in the Tulsa World and the Daily Oklahoman for the sale of the lease located next Bixby, and described as follows, to wit: S½ of SE¼ of 20—17—13 East of I. M., Tulsa county, Oklahoma, and the personal property, consisting of casing and rig thereon.

"The only bid received is that of H. B. Houghton (consisting of $6,300.00), as trustee for J. E. Wright, Geo. Houghton, H. B. Houghton, W. M. Shaver, J. H. Everest, J. S. Twyford, H. L. Houghton.

"Thereupon a motion is made by George Houghton that the meeting adjourn for the purpose of seeing if more money can be received for said property, to which the bidder consented.

"The meeting adjourned.
"H. B. Houghton, President.
"Attest:
George Houghton, Secretary."

It does not appear that any further effort was ever made to obtain a better price, nor does it appear that any one knew anything of such bid, except the two Houghtons. But on April 6, 1916, the $6,300 note at the American National Bank fell due, and a payment of $300 was made thereon with money obtained from the sale of the Zelma Company's property, and the balance of the note extended to July 1, 1916.

On May 13, 1916, a well known as the "Franschot well" was brought in a mile east of the Zelma property, production 300 barrels per day. On June 1st, President Hough-

ton issued a call for a meeting of the board of directors on June 14th. On June 13th, a 500-barrel well was brought in on the C. V. Reed lease, which cornered with the Zelma lease. Vice President Houghton was present at the bringing in of said well.

So on June 14, 1916, President Houghton and Vice President Houghton met again somewhere, the minutes of which meeting were dictated and written up on July. 3, 1916, the day after a 140-barrel well had been brought in on the Zelma's lease, but which purport to show the following proceedings, to wit:

"Meeting of the Board of Directors.

"On the 14th day of June, 1916, the board of directors, consisting of H. B. Houghton and George Houghton, met pursuant to the call of the president, for the sale of the lease and to pay the debt of the company.

"There being no other bids than the one made February 24th by H. B. Houghton, trustee for $6,300.00, it is moved by George Houghton and seconded by H. B. Houghton that the same be accepted, which motion carried.

"Thereupon the officers, to wit, H. B. Houghton and Geo. Houghton, president and secretary of the Zelma Oil Company, were directed by motion to execute and deliver an assignment of the property to wit, E½ of SE¼ of 20—17—13 East of I. M., Tulsa county, Oklahoma, to H. B. Houghton as trustee, for and in consideration of $6,300.00 paid by him to the company, for the purpose of paying off the debts of the company.

"Whereupon the meeting adjourned.

                "H. B. Houghton, President.
"Attest:
"George Houghton, Secretary."

But on the day before the above meeting, to wit. on June 13, 1916, President Houghton, acting for the Zelma Oil Company, conveyed to Vice President Houghton, accepting for the Nemo Oil Company, a one-half interest in the Zelma Company's lease. This assignment shows to have been executed in Oklahoma county on said date, notwithstanding the testimony shows that President Houghton was in Tulsa on that date and that Vice President Houghton was at the aforesaid Reed well on said date, and that they both stayed that night at the Tulsa Hotel in Tulsa.

To summarize briefly: President Houghton, on February 24, 1916, bid $6,300 for the Zelma property, acceptance of which bid was postponed pending future developments. On June 13th, developments being satisfactory, President Houghton assigned one-half of the Zelma Company's property to the Nemo Oil Company, and on June 14th Vice President Houghton accepted the bid of President Houghton made on February 24th and assigned all of the Zelma Company's interest to President Houghton.

Hence at this time the Nemo Company owned a one-half interest in the Zelma Company's property, and President Houghton owned a whole interest in the Zelma Company's property, and the Zelma Company owned nothing. In the meantime another date for the annual meeting of stockholders had passed without a meeting having been held, and without the bona fide stockholders of the company having any knowledge whatever of the affairs of the company, or of the tortuous route of transactions taken by its managers since organization, nor any knowledge that a well had been brought in on the "Franschot" lease in May, nor the one on the Reed lease on June 13, 1916.

Mr. B. L. Brookins, of Tulsa, who had been in the oil business in Oklahoma for the previous 10 or 12 years, engaged during this time in producing oil, operating wells, buying and selling leases, and was well acquainted with the Zelma lease within the Bixby field, testified that after the Franschot well was brought in, in May, the Zelma lease was worth $20,000 or $25,000, and that after the Reed well was brought in, on June 13th, this value was doubled.

On June 19, 1916, the Almez Oil Company was chartered, the temporary directors being H. B. Houghton, George Houghton, W. M. Sawyers, and J. M. Hamilton, but no permanent organization of this company nor election of permanent officers was had until after the development of subsequent events. The Nemo Company was at this time drilling a well on the Zelma lease, in consideration of the one-half interest in the Zelma lease, which President Houghton assigned to the Nemo Company on June 13, 1916. On July 2d oil was struck in this well, producing 140 barrels per day.

Mr. B. L. Brookings and other oil men testified that the Zelma lease was worth from $60,000 to $75,000 after this well was brought in. On the night of July 2d President Houghton was notified of the bringing in of the well, hence July 3d required many things to be done.

The Almez Oil Company was permanently organized on that day with H. B. Houghton, president. On that day President Houghton, of the Zelma Oil Company, conveyed to the Almez Oil Company a one-half interest in the Zelma's lease. On that day the minutes of the meeting of President Houghton and Vice

President Houghton on February 24th were written up, reciting that President Houghton met Vice President Houghton on February 24th and bid $6,300 for the Zelma's lease. On this day also the minutes of the meeting of President Houghton and Vice President Houghton on June 14th were written up, reciting that President Houghton and Vice President Houghton met somewhere on that day, whereupon the bid made by President Houghton was accepted by Vice President Houghton on June 14th, after the Franschot well had been brought in, which made the Zelma's property worth $20,000 to $25 000, and after the Reed well had been brought in which doubled its value, and after the well had been brought in on the Zelma's lease, which raised the value of the Zelma's property to $60,000 to $75,000.

It was also very proper and necessary for the various instruments of assignment of President Houghton of one-half interest in the Zelma's lease to the Nemo Company on June 13th, and the assignment of the entire interest of the Zelma Company to President Houghton on June 14th, and the assignment by President Houghton of one-half interest in the Zelma lease to the Almez Company to have been of record on that date; but they had so much to do on July 3d that it seems they just could not get to it, and the next day, July 4th, being a holiday, said instruments of assignment were not placed of record until July 5th.

So on July 6, 1916, the Almez Oil Company found itself duly organized, with H. B. Houghton as president, and possessed of a one-half interest in the Zelma Company's lease, duly recorded. But the Almez Company enjoyed its possessions but a few days. President Houghton began at once to procure from the stockholders of the Almez Company an option on the purchase of their stock in said company, and by July 17, 1916, had procured an option from all of said stockholders, and a release of all their interest in the Almez Company. Whereupon he (President Houghton) conveyed the Almez Company's one-half interest in the Zelma lease to the Nemo Company, and thereupon the Nemo Company, upon motion of its vice president, Geo. Houghton, executed and delivered to each of the Houghtons, viz.; President Houghton, Vice-President Houghton, and Rev. Houghton, its promissory note for $1,000, as compensation for the skillful manner in which the foregoing deals had been "put over."

The Nemo Company now owned all of the Zelma lease, and had H. B. Houghton for its president; so on July 19, 1916, President Houghton borrowed $6,500 from the Pro-

ducers' State Bank of Tulsa and mortgaged said lease to said bank to secure the payment of said money; and on July 20, 1916, President Houghton with the money borrowed from the Producers' State Bank paid the balance of $6,000 due on the note to the American National Bank of Oklahoma City. Thus President Houghton's bid of February 24th, accepted June 14th, was paid with the proceeds of the note secured by the lease which the Zelma Company once upon a time had owned, and thus the Zelma Company, after its turbulent existence of more than three years, emerged therefrom out of debt, but without a dollar.

So, affairs being seemingly in satisfactory condition, President Houghton took an extended visit to the mountains of Colorado, having first placed the books of the Zelma Company where the stockholders could not get access to them, though several stockholders during this period endeavored to do so. On October 24, 1916, this action was begun. In the latter part of December, 1916, the cause was tried, and on January 20, 1917, a written opinion was rendered against the plaintiffs and the cause comes here upon appeal by plaintiffs.

As stated in the outset, the primary purpose of this action was the cancellation of the drilling contract with Max Moore, and of the various assignments through which the Nemo Company became the owner of the Zelma Company's lease, and the primary grounds of the suit were the numerous acts of fraud perpetrated upon the bona fide stockholders of the Zelma Company by H. B. Houghton, its president, and Geo. Houghton, its vice president.

The trial court held that no fraud had been shown, at least that not sufficient fraud had been shown to warrant a cancellation of the instruments in question; hence a reversal of the judgment depends upon whether in the opinion of this court fraud sufficient to warrant such cancellation was shown. Fraud, if found at all in this case, must be found in or among the various transactions referred to above. The real character of such transactions may be more clearly reflected by their results.

Whatever may be the contentions of defendants in error as to what the facts are, and whatever the authorities cited as applicable to the facts as they contend them to be, there is one potent condition which stands out, bold, glaring, and uncontrovertible, viz.: That the bona fide stockholders, over 50 in number, invested their money in the stock of this company in good faith, upon the representations made by H. B. Houghton, the

president, and George Houghton, the vice president, and others who went out into the stock-selling campaign, immediately upon the organization of the company. That the said stockholders paid the par value in cash for all the stock issued to them, amounting to $4,257. That every dollar of their money was either squandered outright, under and through the manipulations of the two Houghtons, or was spent in development of the Zelma Company's lease, and that the Zelma Company finally lost all of its property, and the bona fide stockholders lost all of their money. On the other hand, the two Houghtons, who had purchased their stock with wild-cat leases, which had cost them absolutely nothing, reached the end of this devious route of transactions with more than 9,000 shares in the Nemo Oil Company, which owned the lease which the Zelma Oil Company had formerly owned, and which was worth $75,000.

In other words, the president and vice president of the Zelma Company, who had invested nothing in said company, came out rich. The bona fide stockholders of the Zelma Company came out with nothing, except their stock in a company which did not own a thing on earth. This result may then throw some light on the character of the foregoing transactions.

Guided by the light of these facts, bearing in mind the rule of presumption, that a person intends to do what he does do, considering the entire history as a whole, and looking upon each transaction as a link in the entire chain, we are quite naturally led to the belief that the incorporators and promoters of the Zelma Company, knowing of the wild-cat leases in McClain county, and that they could be procured for comparatively nothing, conceived the idea of forming a corporation, then procuring as many of such leases as they needed, transferring them to the corporation in exchange for a controlling amount of stock, then selling enough of the remaining stock to whomsoever they could for money enough to reimburse themselves for what they had expended for the wild-cat leases, and then with the balance to either develop such leases or operate in some other field.

At any rate, the company was organized for $50,000, the wild-cat leases procured, transferred to the corporation, a controlling interest in stock issued to the directors, stock enough sold to bona fide subscribers to reimburse the directors for what they had been out in procuring the leases and to begin developments thereon. And from this time on the affairs of the company were so managed

by the Houghtons that in the end the bona fide subscribers had lost all their money, the company had lost its lease, which on the day it was assigned was worth $60,000 to $75,000, and the Houghtons, who had invested nothing, owned a major interest in the lease. Thus the character of the transactions which lead to them is reflected by these results, incompatible with good faith; and such results having been reached by the Houghtons, acting in the capacity of trustees of the welfare of the company, and as guardians of the interest of the stockholders, enjoined and intrusted by law, by the sounder policies of business, and by the standards of common honesty to faithfully keep such trust, such results will not be permitted to stand by a court of equity, nor will such trustees be permitted to thus violate their obligations, and profit thereby to the detriment of their cestui que trust.

The law is averse to this character of contracts and presumes against their validity, while courts of equity look with suspicion upon them and will sustain them only upon clear proof of good faith and adequacy of consideration.

"A contract between two corporations, effected by the votes of directors who are common to both, is presumptively invalid, and can only be sustained by an affirmative showing of fairness and good faith." 10 Cyc. 819, par. 3—citing German National Bank of Hastings v. First National Bank, 55 Neb. 86, 75 N. W. 531; Wheeler et al. v. Abilene National Bank Bldg. Co., 159 Fed. 391, 89 C. C. A. 477, 16 L. R. A. (N. S.) 892, and notes 892 to 895, 14 Ann. Cas. 917; 2 Pomeroy, Eq. (3d Ed.) sec. 958, pp. 1752, 1753; 6 R. C. L. 286, note; 14 Ann. Cas. 921, note; Bear River Orchard Co. v. Hanley, 15 Utah, 506, 50 Pac. 611; Hutchinson v. Sutton Mfg. Co. (C. C.) 57 Fed. 998; 2 Cook on Corporations (6th Ed.) sec. 653; Mobile, etc., v. Gass, 142 Ala. 520, 39 South. 229; Barry v. Moeller, 68 N. J. Eq. 483, 59 Atl. 97; Wardell v. R. R. Co., 103 U. S. 651, 26 L. Ed. 509; 4 Clark & Marshall on Corporations, secs. 258-260, and cases cited.

In the Wardell Case, supra, which involved a character of transactions very similar to those involved here, Mr. Justice Field, who delivered the opinion of the Supreme Court of the United States, says:

"The directors of a corporation are subject to the obligations which the law imposes upon trustees and agents. They cannot, therefore, with respect to the same matters, act for themselves and for it, nor occupy a position in conflict with its interest."

In Stewart v. Lehigh R. R. Co., 38 N. J. Law, 505, the court said:

"The vice which inheres in the judgment of a judge in his own cause contaminates the

contract; the mind of the director or trustee is the forum in which he and his cestui que trust are urging their rival claims, and when his opposing litigant appeals from the judgment there pronounced, that judgment must fail. It matters not that the contract seems a fair one. Fraud is too cunning and evasive for courts to establish a rule that invites its presence."

Reach v. Miller (Ill.) 17 Am. St. Rep. 301, note, Guthrie v. Huntington Chair Co., 71 W. Va. 383, 76 S. E. 795, O'Conner v. Coosa Furnace Co., 95 Ala. 614, 10 South. 290, 36 Am. St. Rep. 251, Sweeney v. Grape Sugar Co., 30 W. Va. 443, 4 S. E. 431. 8 Am. St. Rep. 88, and Gardner v. Butler, 30 N. J. Eq. 702, 703, announced the same doctrine. Many other authorities and equally well-reasoned opinions could be cited in support of the doctrine that contracts of this character are voidable, but it is deemed unnecessary to add to the foregoing list. This doctrine was adopted and followed by this court in Barnes v. Lynch, 9 Okla. 156, 59 Pac. 995, and has not been departed from.

While there is a seeming divergence of opinion on the point as to whether such contracts are absolutely void or merely voidable (10 Cyc. 808, 809), yet when the most widely divergent opinions are analyzed, and the facts upon which they are based are taken into consideration, there is but little real conflict after all. The views taken by different courts, which seemingly have established two lines of authorities, seem to have been actuated mostly by the particular facts with which they were dealing rather than by distinctly different rules of substantive law. As is said in 10 Cyc. 809, 810:

"But perhaps there is no essential difference between this view and the former."

The authorities are in harmony on the question that the burden of proof in such cases is on the trustee to show that his purchase was in good faith; they are in harmony in holding such contracts void where bad faith is shown; they are in harmony in holding that a director of a corporation or a trustee of any character will not be permitted to purchase the property of his cestui que trust and profit by such purchase to the detriment of his cestui que trust; they are in harmony in holding that, where a director votes for the sale of corporate property to himself, such sales are subject to the severest scrutiny by courts of equity, and that the burden is upon such director to show by clear proof that his purchase was in entire good faith, and they are in harmony in holding that stockholders may maintain an action to set aside this character of contracts.

The drilling contract with Max Moore does not seem to have been at all necessary; in fact, from the statement of President Houghton himself, it seems to have been wholly unnecessary. The company owned a good drilling outfit, with all the necessary equipment at this time, and in July, about three weeks before this contract was made, President Houghton told R. L. Cummings that he had plenty of money with which to drill, was going to drill, and would drill on Cummings' 40, if Cummings would give him $300 or some acreage, and doubtless would have drilled, had Cummings done as the Gladys Belle Company had done, and given him the $300 or the acreage.

If the company had plenty of money at this time, and it should have had the $6,300 borrowed from the bank, nothing having been done on the lease since the loan had been obtained, there was then no urgent necessity for such a contract. It was for an inadequate consideration; it was made in violation of the by-laws, which provided that the affairs of the company should be controlled by the board of directors; it was made in violation of the resolution passed by the board of directors May 9, 1914, expressly prohibiting the making of any drilling contracts, except by a majority of the board; it was made without the knowledge or consent of, or any authority from, the board of directors or the stockholders; it was not under the seal of the corporation, nor attested by the secretary thereof; and being an instrument affecting real estate (Duff v. Keaton, 33 Okla. 92, 124 Pac. 291, 42 L. R. A. [N. S.] 472; Eldred v. Okmulgee Loan & Trust Co., 22 Okla. 742, 98 Pac. 929; Allen v. Brown, 6 Kan. App. 704, 50 Pac. 505), and purporting to convey a one-half interest in a lease, affecting real estate, was invalid under section 1187, Rev. Laws 1910, which provides:

"Every deed or other instrument affecting real estate, executed by a corporation, except when executed by an attorney in fact, must be attested by the secretary or clerk of such corporation with the corporate seal attached."

—construed in Randall Co. v. Glendenning, 19 Okla. 475, 92 Pac. 158, and also invalid because not acknowledged in substantial compliance with section 1188, Rev. Laws 1910.

Whether such contract was good as between Houghton and Moore is immaterial in this case, and is not decided; but it was not good as against dissenting stockholders, who had no knowledge of its execution, and who were defrauded by reason of it, and may be repudiated and set aside by the company at the instance of a shareholder. 30 N. J. Eq. 702; 38 J. L. L. 505. The trial court, therefore, was in error when it declined to set aside said contract.

As to the other assignments, the initial steps which led to them were taken December 21, 1915, when President Houghton, Vice President Houghton, and Director Wright met and "devised ways and means." At this meeting it was decided to call a stockholders' meeting for December 31, 1915. The by-laws provided that such a meeting could be called upon the written request of a majority of the directors. They had no majority; so upon the advice of President Houghton, who seemed anxious to "devise ways and means," two directors and one stockholder signed the request upon which the meeting was called to be held in the company's offices, 506 American National Bank Building, December 31, 1915. Notices of such meeting were dated December 21, 1915, but only a few stockholders ever received them, or heard of the meeting, and only a few attended. The meeting was not called to order and no business transacted. At least several witnesses, who were in a position to know, testified to this effect.

It is contended, however by defendants, that the meeting was called to order, and, there being no quorum present, it was adjourned until a later date, January 7, 1916, and that minutes to that effect were written in the minute book. On the other hand, there was evidence that between two weeks and a month after the meeting of January 7th the books were examined and found to contain no minutes of either meeting. But it is immaterial, so far as the character of these proceedings is concerned, whether one or the other contention be true. If the meeting was not called to order, and no business transacted, no understanding had as to what would be done in the future, nor where it would be done, then the meeting on January 7th, being without notice to and unknown to any except the few who benefited by the result, was illegal, and all subsequent proceedings had pursuant thereto, and all conveyances made by virtue thereof, were void, as to dissenting stockholders without notice; on the other hand, if the agreement shown by said minutes was in fact reached, then it was secretly reached, and known only to those few who had the affairs in charge, and kept secret from the rest.

The purported minutes of said meeting recite that it was called to order by President Houghton to ascertain whether a legal majority was present. They do not show that the list of stockholders was called, but purport to show only that George Houghton read the number of shares present, in person and by proxy, the owners of which consisted, for the most part, of the three Houghtons and their wives and the directors, but do not show that the name of any other stockholder was called. They do not purport to show that the names of any of the absent stockholders were called, numbering more than 50, nor do they show that the names of any of those who were present and testified at the trial that no proceedings were had were called. They show that only 14,688 shares out of a total of 37,482 were present. They show that by motion the meeting was adjourned to 9 o'clock, January 7th.

Hence, if such proceedings were had, and the minutes actually written up, they serve only to stamp the character of such proceedings with deeper deceit. It was observed that such minutes do not state where the meeting was to be held. If all parties present had known that it actually adjourned to January 7th, they would naturally have presumed that it would be held at the company's offices; but it was not held there. It was held in a different building; hence the minutes themselves constituted deceit upon those present, if they had had actual knowledge of the proceedings. The minutes of the meeting of January 7th, after reciting that the meeting was called to order and giving a list of the shares present, are as follows:

"Motion was made by Mr. J. H. Everest that the officers and directors of the company be authorized and directed to sell the property of the company, consisting of certain leases near Bixby and personal property thereon, at public or private sale, for the largest sum available, to pay the debts of the company, and that a written notice be given each stockholder of the sale and of this resolution, and each stockholder of the Zelma Oil Company has the right to subscribe for such proportion of stock in the new company as his stock in the old company bears to the paid-up capital in the old company.

"This motion was seconded by Mr. F. M. Archdeacon. Motion being made, seconded, and carried.

"The capital stock of the new company to be $15,000. The name of the new company to be 'Zelma Oil Company Number Two.'

"Stock to be paid for 50 per cent. cash on organization and 50 per cent. as called in by directors.

"There being no further business, the meeting adjourned."

In reviewing these proceedings, it is noted that the request of December 21, 1915, to the president, was to call a meeting for the purpose only of considering ways and means of paying the debts of the company, and the advisability of selling some or all of the company's property, and that the letter purporting to give notice of such request to the stockholders stated that the meeting would be

held for the purpose of considering ways and means of paying the debts of the company, and selling a portion or all of the property of the company, and also authorizing the directors to make such sale, thus going another step further than authorized by the request. It is noted, also, that the letter stated that such request was by a majority of the directors, which was not true.

From this point the significance of Houghton's altering the Sawyers' resignation becomes apparent, as it was necessary to show a majority of directors present and participating at the "devising of ways and means." And at the meeting of January 7th they went still another step further, by agreeing to organize a new company to be known as "Zelma Oil Company Number Two."

The minutes do not show how this agreement was reached, nor do they show that such proposition was ever submitted to the meeting, or that even the few stockholders who were present were given an opportunity to vote on the proposition; hence the agreement to organize a new company was reached on the outside, and not by the stockholders in the meeting. The minutes, however, do show that a motion was adopted which provided that "the officers and directors of the company be authorized and directed to sell the property," and that "a written notice be given each stockholder of the sale," neither of which provisions were complied with. At any rate there were about 50 stockholders— in fact, practically all of the bona fide stockholders—who never received such notice, knew nothing about either meeting or the intended sale, nor did they know anything of the intended organization of the new company, the "Zelma Oil Company Number Two," which was never organized. Hence, if all of the stockholders had received the notice, they would have been misled and deceived thereby. The notice, set out above, which was published in the Tulsa World, stating that written bids would be received up to and including the 23d day of February, 1916, and stating that said lease would be sold to the highest bidder for cash, was a deceit also, even if the stockholders had seen it, which they did not; but, had they seen it, it was a deceit and fraud, for the reason that said notice was not in any sense complied with. In the first place, the first publication was made February 20th, and the last day for receiving bids was February 23d.

In the second place, it was not sold upon a written sealed bid, nor was it sold for cash. The only man who sought to make a bid, W. C. Elliot, of Tulsa, was discouraged by President Houghton and given to understand that no bids were wanted, and the sale was clandestinely made by one Houghton to the other. On the next day, February 24, 1916, the meeting between President Houghton and Vice President Houghton took place somewhere, the minutes of which were written up five months later, but which showed that President Houghton told Vice President Houghton that he would bid $6,300. He filed no written bid, nor paid any cash; but Vice President Houghton took President Houghton's word for it, that he would pay $6,300 for the lease, which it appears he never paid.

It is claimed by defendant in error that he paid the $6,300 note due the American National Bank, in consideration of which Vice President Houghton assigned the entire lease to President Houghton; but it appears from the record that on February 1st, President Houghton had organized the Nemo Oil Company, and on June 13, 1916, conveyed one-half interest in the Zelma Company's lease to the Nemo Oil Company, which he could not legally do on that date, because he did not then own it. The lease was not in his name on that day. The assignment was not made by Vice President Houghton to him (President Houghton) until June 14th; hence on June 13th, President Houghton had no one-half interest in the lease to convey to the Nemo Oil Company.

But on June 14th Vice President Houghton conveyed the entire lease to President Houghton, and subsequently President Houghton, having organized the Almez Oil Company on June 19th, and conveyed to it a one-half interest in the Zelma Company's lease, conveyed this, the other one-half interest, to the Nemo Oil Company, and then mortgaged all of said lease to the Producers' State Bank of Tulsa to secure a loan of $6,500, and with the proceeds of it paid off the $6,300 at the American National Bank; therefore it was the Zelma Company's lease that paid off the note, and not President Houghton.

So, whether each transaction be viewed separately, or all be taken as a whole, the same result is met. From the day of its organization to the day on which its last property interest passed to the Nemo Company, there was not a step taken, not a turn made, wherein the bona fide stockholders of the Zelma Oil Company had a voice, or were permitted to share in the profits of the transactions. On the other hand, not a turn was made but which, considered in its relation to subsequent events, resulted in a material advantage to the Houghtons personally, and in a corresponding detriment to the bona fide stockholders. The trial court, therefore, erred in refusing to cancel and set aside the assignments herein sought to be canceled.

The assignment and conveyance from Houghton to Max Moore was invalid, for the reasons above given; likewise the assignments to H. B. Houghton as trustee, the assignment of one-half interest by H. B. Houghton to the Nemo Oil Company, the assignment by H. B. Houghton to the Almez Oil Company, and the subsequent assignment of the same interest by H. B. Houghton to the Nemo Oil Company, were all invalid, fraudulent, and void, as against plaintiffs herein, and other bona fide stockholders like situated, and the trial court should have so held.

It is urged by defendants in error that said assignments are valid, for the reason that at the meetings held on December 31, 1915, and on January 7, 1916, there was a majority of shares present, and that by the majority of shares in the company it was decided to do the things which were subsequently done. This contention is without merit, either under the record or under the law.

In the first place, it is not shown by the record that even the shares that defendants in error claim were present at said meetings were voted on the proposition as to whether the things would be done which were done; on the other hand, it appears from the record, from the minutes of the purported meetings, upon which defendants in error rely, that no formal vote of shares was ever taken. If the meetings were held, and the motion adopted at the January meeting, which the minutes show was adopted, then the sale of the Zelma Company's interest was invalid, because it was made, as above stated, in direct violation of the motion.

In the second place, the contention is without merit under the law, for the reason that the shares which it is claimed were present and constituted a majority of shares were void, under sec. 39, article 9, of the Constitution, and under the authority of Lee v. Cameron, 67 Oklahoma, 169 Pac. 17, wherein this court, in an opinion by Mr. Justice Rainey, construed section 39, article 9, of the Constitution, and held:

"Watered stock, or fictitiously paid-up stock, is stock which is issued as fully paid-up stock, when in fact the whole amount of the par value thereof has not been paid into the treasury of the company. All stock which has been issued as paid-up stock, but the full par value of which has not been paid into the corporation in money or money's worth, is watered to the extent that the par value exceeds the value actually paid into the treasury. Watered stock is, accordingly, stock which purports to represent, but does not represent, in good faith, money paid into the treasury of the company, or money's worth actually contributed to the capital of the concern, * * * and the stock so issued is void."

Therefore the shares which, as contended by defendants, constituted a majority of the stock of the corporation, were fictitious and void under said constitutional provision, and will not be permitted to be voted and counted in order to constitute a majority of stock, to the detriment of stockholders who have paid par value, and to the advantage of holders of void stock. It was well said by this court in Lee v. Cameron:

"This provision of our Constitution was intended by its framers and the people who adopted it to prevent the issuance by corporations of 'watered or fictitiously paid-up stock.'"

It is also contended by defendants in error that the contract of employment between plaintiffs and their attorneys, Twyford & Smith, attorneys at the trial below, was champertous, and that the action therefore is not maintainable by plaintiffs, and that the judgment of the trial court should be affirmed. At any rate the effect of sustaining such contention would be to affirm the judgment; but this question was not decided by the court below, and is not appealed from. The plaintiffs below are plaintiffs in error here, and have not appealed from the judgment rendered upon this issue; the issue was not pleaded in the trial court, nor plaintiffs given an opportunity to meet such issue nor the trial court given an opportunity to decide such issue, and cannot be raised for the first time here. Hence it is not necessary to decide whether such contract is champertous, nor whether, if it be champertous, the defendants would be permitted to defend against fraudulent conveyances upon this ground.

It is also argued by defendants in error that the judgment should be sustained because of the interest of innocent investors in the stock of the Nemo Oil Company, but it does not appear from the record that any person not already a stockholder in the Nemo Oil Company bought it after the assignment to the Nemo Oil Company by the Houghtons of the first one-half interest in the Zelma Company's lease. On the contrary, it appears from the record that all of the stockholders in the Nemo Oil Company purchased a portion or all of their stock before the Nemo Oil Co. acquired its first one-half interest in the Zelma Company's lease; hence this contention cannot be sustained.

It is also contended that large amounts of money had been expended by the Nemo Oil Company in the development of the lease originally owned by the Zelma Company, and while the contention that $75,000 or $80,000 had been spent in developing such lease is not sustained by the evidence, yet it is pos-

5—76

sible that some money was actually expended by the Nemo Oil Company in developing such lease; on the other hand, it appears conclusively that a very considerable amount of oil had been sold off of said lease by the Nemo Oil Company, none of which amount was accounted for to the Zelma Company; hence, if any amount was actually expended by the Nemo Oil Company in developing said lease, such amount, less the amount of oil sold off of said lease, should be paid back to the Nemo Company by the Zelma Company. This would necessitate an accounting, which should have been granted in the first instance by the trial court.

It is also contended that the Zelma Company, having knowledge of the transactions and having participated in the profits thereof, is now estopped from maintaining this action to set aside the instruments of assignment made by it. We are unable to conceive of the foundation upon which this contention is based, except that the trial court held to this effect, though in so holding and deciding it fell into grievous error. As stated above, there was not a transaction made nor a step taken in the affairs of the Zelma Company wherein it was benefited one penny by the transaction, nor a transaction made but the Zelma Company sustained a detriment by reason thereof, and the bona fide stockholders, including these plaintiffs and 41 others, bore the burden of the detriment. Besides, the court erred further by holding this to be a suit by the Zelma Company, and by holding that the right of plaintiffs to recover rested upon the same grounds with the Zelma Company's right to recover.

The facts are that these plaintiffs and other bona fide stockholders knew nothing of the conveyances in question, they were unable to get access to the books of the company, they employed attorneys and went to the offices of the company for the purpose of examining the books, and found that they had been taken away by President Houghton and that these plaintiffs, and other stockholders like situated, were unable to get the Zelma Company as a company to take any action in the premises. The affairs of the company were under the control of the fraudulently acquired majority interest in the stock, and a few stockholders, including the Houghtons, who had control of this fraudulently acquired and void stock, were managing the affairs of the company to their own interest personally, and could not be induced to bring suit in the name of the company to cancel conveyances, which they had fraudulently made in the name of the Zelma Company, and by which they were personally benefited.

These, we believe, constitute all the contentions made by defendants in error which it is necessary for this court to pass upon. There are other contentions made—several others; but the conclusion we have herein reached in reference to the matters decided being true, such contentions are necessarily not true.

The judgment of the trial court is reversed, and the court instructed to order a proper accounting by the Nemo Oil Company of the profits derived from the lease and the money expended thereon, and to render judgment in accord with the conclusions herein reached.

All the Justices concur.