## CENTRAL TRUST CO. OF ILLINOIS et al. v. SOUTHERN OIL CORPORATION et al.

## BADGER OIL CO. v. CENTRAL TRUST CO. OF ILLINOIS et al.

(Circuit Court of Appeals, Eighth Circuit. September 14, 1925.)

Nos. 6802, 6803.

1. **Subrogation** ⬅4—**Oil corporation's notes, secured by mortgage bonds and indorsed by stockholder held not accommodation paper, as affecting indorser's rights.**

Where oil corporation, leasing for short term refinery which it contemplated purchasing, paid note of refining corporation by giving its own note, secured by pledge of mortgage bonds, and received credit for amount of note on debt due refining corporation for raw materials used, and in addition borrowed money on notes secured by pledges of mortgage bonds, which it paid to refining corporation and also on account of raw materials used, *held*, such notes of oil corporation, indorsed by one of its stockholders, were not accommodation paper, as affecting rights of indorsing stockholder, compelled to pay notes to protection of security pledged.

2. **Mines and minerals** ⬅105(1)—**Oil corporation's execution of notes connected with contemplated purchase of refinery held not ultra vires.**

Oil corporation's giving of notes secured by mortgage bonds, in connection with its trial operation of refinery which it was contemplating purchasing, *held* not ultra vires, particularly in view of Comp. St. Okl. 1921, § 5322.

3. **Corporations** ⬅545(1)—**Intent to defraud creditors in oil corporation's transactions affecting purchase of refinery held not established.**

Purpose or intent to defraud creditors in oil corporation's transactions with regard to trial run of refinery which it was contemplating purchasing from a corporation in which some of its controlling stockholders were largely interested *held* not established.

4. **Corporations** ⬅469—**Notes of corporation secured by mortgage bonds held not fictitious indebtedness, void under Constitution.**

Where oil corporation, making trial run of refinery which it contemplated purchasing, borrowed money to pay for raw materials belonging to refinery, which it used, on notes secured by mortgage bonds and indorsed by stockholder, *held*, such notes did not constitute a fictitious increase in corporation's indebtedness, void under Const. Okl. art. 9, § 39, assuming that such section might be construed to apply to mortgage bonds.

5. **Corporations** ⬅474—**Good-faith disposition of mortgage bonds of private corporation for corporate purposes not subject to successful challenge.**

Subject to constitutional or statutory regulation, private corporations for gain may pledge or otherwise dispose of their mortgage bonds for corporate purposes, and if in so doing their directors exercise an honest business judgment,

transaction is valid, and not subject to successful challenge.

**6. Subrogation ⊗⇒4—Stockholder, indorsing and ultimately paying notes of corporation, held entitled to subrogation to rights of payees in matter of security.**

Where oil corporation, conducting under lease trial run of refinery which it was contemplating purchasing, paid note of refinery by giving its own note secured by mortgage bonds, and received credit on account for raw materials used which belonged to refining corporation, and from other sources borrowed money on notes likewise secured, which was also used to pay for raw materials, all of which notes were indorsed and ultimately paid by stockholder, *held* stockholder or his estate was entitled to subrogation to rights of payees in matter of security.

**7. Corporations ⊗⇒298(7)—Failure of board of directors to make record of meeting at which transaction was authorized held not to invalidate it.**

Where all officers and directors of oil corporation were present at meeting at which lease of refinery was discussed and consented to, failure of board of directors to make proper record of such meeting *held* not to invalidate transaction.

**8. Corporations ⊗⇒545(1)—Pledge of corporate mortgage bonds held unlawful preference void as to other creditors.**

Where director of corporation, owning approximately one-third of its stock at time when corporation was insolvent, joined in pledge of mortgage bonds to secure pre-existing debt to corporation owned by himself and another stockholder of debtor corporation in equal shares, *held,* pledge was unlawful preference, invalid as against creditors.

**9. Corporations ⊗⇒544(1)—Preferences given by corporation, unable because of insolvency to continue business, voidable.**

As general rule, when corporations cannot continue in discharge of their corporate functions because of insolvency, preferences which they may give are voidable.

**10. Corporations ⊗⇒545(1)—Directors of hopelessly insolvent corporation occupy fiduciary relation to creditors.**

Directors of corporation, unable because of insolvency to continue business, occupy a fiduciary relation toward creditors, though insolvency alone will not place directors in such position, if there is reasonable hope that corporation, can be made solvent.

Appeal from the District Court of the United States for the Eastern District of Oklahoma; Robert L. Williams, Judge.

Proceeding by the Central Trust Company of Illinois to foreclose a trust deed given by the Southern Oil Corporation. From an order holding that bonds presented by the administrator of Thomas E. Brittingham, Sr., deceased, were entitled to share equally with other shares in the sale of the mort-

gaged property, the Central Trust Company of Illinois and another appeal; and from an order holding the claim of the Badger Oil Company unsecured, and not entitled to payment out of proceeds of the sale of the mortgaged property, the Badger Oil Company appeals. Affirmed on both appeals.

George G. King, of Chicago, Ill., and C. E. Cooper, of Tulsa, Okl. (Max Pam and Harry B. Hurd, both of Chicago, Ill., H. W. Randolph, John A. Haver, and Randolph Shirk, all of Tulsa, Okl., on the brief), for Central Trust Co.

L. B. Coppinger, of New York City, and Benjamin C. Conner, of Tulsa, Okl., for Pennsylvania Tank Line.

Herbert H. Thomas, of Madison, Wis., and George S. Ramsey, of Tulsa, Okl. (John M. Olin and Harry L. Butler, both of Madison, Wis., and Edgar A. De Meules and Villard Martin, both of Tulsa, Okl., on the brief), for Thomas E. Brittingham, Sr., and Badger Oil Co.

Before LEWIS, Circuit Judge, and VAN VALKENBURGH and FARIS, District Judges.

LEWIS, Circuit Judge. The Southern Oil Corporation was incorporated under the laws of Oklahoma in 1914, with an authorized capital of $25,000. In August, 1919, with consent of all stockholders, it executed its mortgage or trust deed to Central Trust Company of Illinois as trustee, by which it conveyed to the Trust Company its property in Oklahoma and Texas, consisting of lands, oil leases, pipe lines, tank cars, refineries and personal property for the purpose of securing payment of $1,000,000 of its negotiable bonds to be issued. In December, 1922, a receiver was appointed and he took charge of its property. It had become insolvent. The mortgage was foreclosed and after sale the administrator of the estate of Thomas E. Brittingham, Sr., deceased, presented to the court $190,000, face value, of the mortgage bonds as being entitled to share equally with other bonds that had been issued in the proceeds of the sale of the mortgaged property. The claim of the administrator was allowed and this appeal is from that order.

The contest is over the purpose for which these bonds were issued and the way in which they came to the hands of Brittingham,—it being the claim of appellants, the trustee and an unsecured creditor, that they were unlawfully or fraudulently issued, to the knowledge of Brittingham, and should be surrendered by his administrator for cancellation. The

facts in that regard will be stated. The issued stock of the Southern Oil Corporation was owned by R. S. Ayers, George L. Woodard and Thomas E. Brittingham, Sr., each having one-third, except Brittingham held his in trust for members of his family, Ayers' brother had a small interest in his third, and Woodard's wife had an interest in his third. Ayers, Woodard and C. R. Monfort, who held one share which belonged to Woodard, constituted the board of directors and were at all times the officers of the corporation from the time of its organization. Ayers was president, Woodard vice-president, and Monfort secretary and treasurer. Brittingham was at no time an officer or director and did not give the corporation his personal attention. He appears to have been a wealthy man and was so rated.

The Inter-Ocean Refining Company, an Illinois corporation, owned and operated an oil refinery at McCook, Illinois. Its issued capital stock amounted to $600,000, of which Brittingham, John Alexander and George C. and J. M. Hixon each purchased $10,000, par value, in September, 1918. The three last-named persons were associated with Brittingham in the lumber business. His son-in-law, Bryan S. Reid, had the management of the Inter-Ocean Company and was a large stockholder, owning 1,700 shares in the company. Brittingham bought the shares that Alexander and the Hixons had purchased and gave them and his own shares to Reid, in June, 1921. He was not thereafter a stockholder in that company. He was its president from May, 1920, to June, 1921. He knew nothing about the oil business. There was a first mortgage for $250,000 on the Inter-Ocean plant. A second mortgage of $400,000 was held by Brittingham, Alexander and the Hixons. Later Brittingham loaned the Inter-Ocean $200,000. The Wadhams Oil Company of Milwaukee was a large stockholder in the Inter-Ocean Company, and it'loaned that company $150,000, which, with the $200,000 loaned by Brittingham, was secured by a third mortgage. Thereafter Brittingham loaned the Inter-Ocean Company $10,000 in September, 1920. Woodard owned 1,800 shares in the Inter-Ocean. Ayers does not appear to have been interested in that company.

Early in 1920 Woodard proposed that the Southern Oil Corporation acquire the plant of the Inter-Ocean Company by purchase of its issued stock. He wrote to Reid on that subject in March, 1920, and he testified that Ayers co-operated with him for that purpose. It was thought to be to the advantage of the

Southern Oil Corporation to acquire the Inter-Ocean plant, if its issued stock could be obtained at a reasonable price. Reid testified that Ayers talked to him about it and urged that the plan be carried out. Woodard went to Milwaukee during the summer of that year and in conference with representatives of the Wadhams Company it was ascertained that the shares which it held, 1,251, could be purchased at $42.00 each, which, together with Woodard's 1,800 shares, which he proposed to turn over to the Southern Corporation without charge, would constitute a control. The remainder of the stock was to be acquired if it could be had at reasonable prices. Finally, on December 30, 1920, a meeting was held at the Southern Corporation's office in Chicago for the purpose of considering the proposed acquisition of the Inter-Ocean's plant by the Southern Corporation. There were present at this meeting Ayers, Woodard and Monfort, who were all of the directors and officers of the Southern Corporation, Brittingham, who with Ayers and Woodard represented all of the stock of that corporation, Cramer, Dodge and Marshutz, who represented the Wadhams Company and the shares of stock which it held. Reid, John Alexander, George Hixon and the Inter-Ocean's attorney were also present. The principal and immediate purpose of the meeting was to consider a proposed lease by the Inter-Ocean of its plant to the Southern Corporation,—whether such a lease should be given, on what terms and for what length of time. The lease was desired by the Southern Corporation for the purpose of enabling it to determine whether or not it was willing to go forward in the acquisition of the plant by the purchase of the issued stock of the Inter-Ocean Company. The meeting lasted for about three hours. There was no opposition to the giving of a lease, but its terms and the length of time it should run were given extended consideration. Reid had been operating the plant at a loss; but the Southern had been operating its plants in Oklahoma at large profits. In 1918 it made net profits from operations of $407,650.69, in 1919 $406,110.38, in 1920 $409,750.17, and after adding other income during those three years and deducting other expenses aside from operating it had net profits for those three years of $771,190.92. Early in 1921 prices declined sharply and the oil business became disastrous to many who were engaged in it. During the fifteen months extending from January 1, 1921, to March 31, 1922, the Southern suffered a net loss of $1,212,-

416.62. The representatives of Wadhams Oil Company agreed to give an option on the stock which that company held to the Southern Corporation at $42.00 a share, to be taken up during the lease. The purpose of the Southern Corporation in taking a lease was to enable it to make a test of the plant in order that it might determine whether to exercise its option. There was a large amount of raw material at the plant which would be consumed in operation. Terms of the lease were finally agreed upon and the attorney of the Inter-Ocean was instructed to draft it. It was then executed by the officers of the two companies and reads thus:

"This indenture, made and entered into this 31st day of December, A. D. 1920, by and between Inter-Ocean Refining Company, a corporation duly organized and existing under and by virtue of the laws of the state of Illinois (for convenience hereinafter termed the 'lessor'), and Southern Oil Corporation, a corporation duly organized and existing under and by virtue of the laws of the state of Oklahoma (for convenience hereinafter termed the 'lessee'), witnesseth:

"That the lessor has demised and leased, and by these presents does demise and lease unto the lessee the oil refinery and the equipment, machinery, cars, and appliances of the lessor used or intended for use in connection with such oil refinery, for the period beginning as soon after January 1, 1921, as may be convenient to the lessee and ending July 31, 1921, in consideration whereof said lessee covenants, promises and agrees as follows:

"1. To purchase from the lessor and from time to time pay for the oils, supplies and materials of the lessor taken and used by the lessee during the term hereof, a list of which oils, supplies and materials of the lessor now on hand is hereto attached, marked 'Exhibit A' and hereby made a part hereof.

"2. To pay any and all operating and overhead expenses during the term of this indenture.

"3. At the termination of this indenture to return, yield up and deliver to the lessor said refinery, equipment, machinery, cars, and appliances, also such of said oils, supplies and materials as shall not have been used and paid for by the lessee, in as good condition as when the same were received, ordinary wear and tear excepted; but the lessee may replace such oils, supplies and materials taken or used by it during the term hereof by substituting in lieu thereof other oils, supplies and materials of equal quantity and quality; and if, after accounting by the lessee for the oils, supplies and materials of the lessor so taken and used there shall remain on hand an excess of oils, supplies or materials acquired or accumulated by the lessee such excess shall be retained by the lessor and be paid for upon such terms and at such price or prices as may be agreed upon between the parties hereto.

"4. To indemnify, save harmless, protect and defend the lessor of and from any and all actions, causes of action, suits, debts, dues, sums of money, obligations, contracts, damages, court costs, attorneys' and solicitors' fees, expenses, claims and demands of every kind, name, nature and description which may arise from or in connection with the operation of said refinery or any of the equipment, machinery, cars and appliances thereof, during the term hereof, or occasioned by the lessee.

"This indenture and all the covenants, promises and agreements herein contained, shall inure to the benefit of and be binding upon, not only the parties hereto, but also their respective successors and assigns.

"In witness whereof, the lessor and lessee have caused this instrument to be executed in their respective names and behalf by their respective duly authorized officers and their respective corporate seals to be hereunto affixed and attested on the day and year first above written.

"Inter Ocean Refining Company,
"By T. E. Brittingham, President.
"Attest: Bryan S. Reid, Secretary. [Seal.]
"Southern Oil Corporation,
"By R. S. Ayers.
"Attest: Chas. R. Monfort, Secretary.
"[Seal.]"

At that time $327,000 mortgage bonds had been issued by the Southern. On expiration of the lease it was extended to January 1, 1922, at the request of the Southern Corporation, on a flat rental of $10,000 per month. Its option to purchase the Wadhams Company's stock was not exercised, and, as stated, the Southern went into the hands of a receiver in December, 1922, about one year after the lease as extended had expired. During the lease period and its extension the Southern operated the plant. It took over and paid the Inter-Ocean for consumable current assets valued at approximately $200,000. In doing so the letter of the lease was not strictly followed, that is, the oils and other material taken and used were not paid for from time to time as used, but in large part before they were actually consumed. Reid was in charge of operations. The books were kept just the same as they had been be-

fore the lease. Accountants for the Southern visited the plant and profit and loss statements were furnished to the Southern from time to time. Monthly reports were rendered to the Southern, and the books showed a record of the profit and loss in operation under the lease. During the first half of the year the losses were large, during the second half the profits were large,— the net result being a loss of about $48,000 for the entire year. The purpose was to ascertain what the plant could do as a unit, and the accounts for that reason were not mingled with and kept in the name of the Southern. It, however, sustained the loss or received the benefits of operation. In 1921, while the Southern was operating the plant at McCook, it advertised it to the trade through its sales manager as the Southern Refinery. It appears that the parties looked to Brittingham to arrange financing operations of the plant under the lease. He went to California soon after the meeting, and just before leaving, perhaps also in part by letter after reaching California, he made arrangement by which the Southern was to discharge and did discharge its obligation to pay for the oils, other material and current assets which it took over. By that arrangement, discussed and agreed to at the meeting of December 30, 1920, the Southern Corporation obtained three loans of $50,000 each, for which it gave its notes and secured their payment by pledging an equal amount of its mortgage bonds with each note; and the $150,000 was paid over to the Inter-Ocean on the purchase price of the oils, other material and current assets which the Southern took over. Brittingham guaranteed the payment of these notes. One of them was given to John Alexander, one to George C. Hixon, and the remaining $50,000 was obtained on two notes of $25,000 each, given to the Commercial National Bank of Madison, Wisconsin. The Inter-Ocean Company had given two notes, one for $25,000 and one for $15,000. They were paid off by the Southern Corporation, which gave its notes in lieu thereof and pledged with them as collateral security $40,000 of its mortgage bonds. Brittingham guaranteed the payment of these notes, and the $40,000 was credited to the Southern Corporation as additional payment on the oils and current assets. These notes all appear to have been given during January and February, 1921. They were renewed from time to time by notes of like amounts executed by the Southern Corporation by either Ayers as president or Woodard as vice-president, and as renewed the prior notes were taken up and sent to the Southern Corporation, and were found among its papers by the receiver. All of the notes and bonds were delivered to the payees by Ayers or Woodard. Eventually Brittingham was required on his guaranty to pay, and he did pay to the holders of these notes the full amounts for which they were given. The notes were all endorsed to him without recourse, and the $190,000 in mortgage bonds of the Southern, which it had pledged with the notes as collateral security, were turned over to Brittingham, and these are the bonds presented by the administrator of his estate as entitled to share in the proceeds of sale of the mortgaged property.

[1] It is contended for appellants that the Southern Oil Corporation's notes for $190,000, with which it pledged its bonds, were accommodation paper. We think the facts afford no basis for this contention. These notes were given for the purpose of meeting and discharging the obligations which the Southern assumed under the lease. It is true the terms of the lease in that respect were not strictly followed. The oils and other material used and the current assets of the Inter-Ocean taken over by the Southern were not paid for from time to time as the lease stated they should be; but the Southern obtained credit on that obligation when it borrowed the $150,000 on its notes and turned that sum over to the Inter-Ocean, and it obtained a like credit when it substituted, by arrangement with the Inter-Ocean, its two notes for $40,000 for the notes of like amounts of the Inter-Ocean. Those transactions on the part of the Southern were all to its direct benefit and it received the full consideration. That claim is, therefore, in our judgment wholly without support.

[2] It is further contended that the giving of its notes for $190,000 and the pledging therewith of its mortgage bonds by the Southern Oil Corporation were acts ultra vires. The articles of incorporation are not found in the record, but it clearly appears that it was organized for the purpose of purchasing and refining crude oil and disposing of the refined products. It had two refineries in Oklahoma and owned pipe lines for transportation of oils. It maintained branch offices in other states in carrying on its business. The plant of the Inter-Ocean Company at McCook was near Chicago, and the object of the Southern in its efforts to acquire that plant was to have near at hand a large market for the refined output at that plant. Its mortgage given to se-

cure the one million dollars in negotiable bonds to be thereafter issued provided that all of those bonds should be forthwith executed by the corporation and delivered to the trustee for authentication and that the trustee should thereupon deliver them back to the president of the corporation or upon his order. The mortgage covered not only the properties that the corporation then owned but all properties of every kind and character wheresoever situated that the corporation from time to time thereafter should acquire. It recited that the corporation was authorized to borrow money from time to time for its corporate purposes and to issue therefor its bonds, notes or other obligations and to secure the prompt payment thereof by mortgage or pledge of its properties, real, personal or mixed. In view of the business to be carried on by the corporation and the purposes for which its bonds were to be issued, as disclosed in the mortgage securing them, it appears to have been clearly within its powers to enter into the lease agreement and later purchase outright or through stock ownership the Inter-Ocean plant if, in the judgment of its board of directors, it had been found to its advantage to do so. It asserted its right in the mortgage to borrow money for corporate purposes, and the statutes of the State in which it was incorporated invested it with that right. Section 5322, Okl. Comp. St. 1921 (§ 1241, Rev. Laws Okl. 1910), empowered it "to purchase, hold, transfer and convey such real and personal property as may be necessary and proper for carrying on the business of the corporation and to sell and dispose of the same when not required for the use of the corporation * * * to enter into any obligations or contracts essential to the transaction of its ordinary affairs, or for the purposes of the corporation." The mortgage gave notice to all purchasers and holders of bonds and other creditors that "the company is duly authorized to borrow money from time to time for its corporate purposes and to issue therefor its bonds, notes or other obligations, and to secure the prompt payment thereof by mortgage or pledge of its rights and privileges and of all its properties, real, personal and mixed." We think it too clear for argument that its transactions with the Inter-Ocean Company in taking the lease and the borrowing of the $190,000, for the payment of which it pledged its bonds, were not ultra vires, that if the power was not expressly given it was clearly an implied one. Cook on Corporations (8th Ed.) vol. IV, § 763; Grommes

v. Sullivan, 81 F. 45, 26 C. C. A. 320, 43 L. R. A. 419; Central Trust Co. v. Railway Co. (C. C.) 87 F. 815, 821; Jones v. Guaranty & Indemnity Co., 101 U. S. 622, 25 L. Ed. 1030; Fletcher Cyc. Corps. vol. II, §§ 971, 1032.

[3] There is in our opinion no proof that the transactions complained of were entered into by the Southern Oil Corporation with the purpose and intent to defraud its creditors, nor is it claimed that those transactions brought about the insolvency of the Southern. Brittingham testified that in answer to his inquiry Woodard wrote to him of date April 16, 1918 (letter received in evidence) stating that in his opinion the Southern had net assets of $1,400,000, over its liabilities, that he relied on that statement and knew nothing to the contrary as to its financial condition, that he never attended a stockholders' or directors' meeting, that Woodard, Ayers and Monfort constituted at all times the board of directors and officers and Woodard and Ayers had entire charge and management of the business and affairs of the corporation, and that he gave it none of his attention.

[4] Appellants also rely on section 39 of article 9 of the Oklahoma Constitution in support of their claim that the bonds were unlawfully pledged. The section reads:

"No corporation shall issue stock except for money, labor done, or property actually received to the amount of the par value thereof, and all fictitious increase of stock or indebtedness shall be void, and the legislature shall prescribe the necessary regulations to prevent the issue of fictitious stock or indebtedness. The stock and bonded indebtedness of corporations shall not be increased except in pursuance of general law, nor without the consent of the persons holding the larger amount in value of the stock first obtained at a meeting to be held after thirty days' notice given in pursuance of law."

[5] Kemmerer v. St. Louis Blast Furnace Co., 212 F. 63, 128 C. C. A. 519; Mudge v. Black, Sheridan & Wilson, 224 F. 919, 140 C. C. A. 397; In re Progressive Wall Paper Corporation, 229 F. 489, 143 C. C. A. 557, L. R. A. 1916E, 563; Farmers' Loan & Trust Co. v. San Diego Street Car Co. (C. C.) 45 F. 518; and Edgar v. Ames, 255 F. 835, 167 C. C. A. 163—are relied on. It is the general rule that commercial or private corporations for gain may pledge or otherwise dispose of their mortgage bonds for corporate purposes; and if in so doing their directors and officers exercise their honest

business judgment, the transaction is valid and not subject to successful challenge. Cook on Corporations, supra; Jones on Collateral Securities (2d Ed.) §§ 70, 71; 14a C. J. p. 546, § 2475. This rule, of course, may be changed or modified by the constitution or statutes of the State in which the corporation is organized; and the section of the Oklahoma constitution, supra, is here relied on to sustain the contention that the pledge of the $190,000 in bonds was unlawful and voidable. In the Edgar Case, supra, that section was brought under consideration. The Oklahoma City Times Company, engaged in publishing newspapers at Oklahoma City, issued and delivered its bonds to the amount of $135,000, secured by mortgage on its property. Unsecured creditors challenged the transaction, basing their attack on the claim that the bonds were all void under the second clause of the constitutional prohibition because they created a fictitious indebtedness. It was held by the trial court and affirmed here that bonds to the extent of $50,000 issued to named persons for property of that value were valid, and that the remaining $85,000 in bonds not having been issued for any consideration to the corporation, were void. The Edgar Case is wholly unlike the Kemmerer and Mudge Cases, both as to the law and the facts. They are not cited in the Edgar Case, and it is there said:

"It will be noticed that, while this section 39 prohibits the issue of stock, except for money, labor done, or property to the amount of the par value thereof, it does not prohibit the issue of bonds, except for such considerations, as many state constitutions and statutes do."

And then, in apparent reference to the contention of creditors it was further said:

"Conceding, without admitting or deciding, that $85,000 of the $135,000 mortgage indebtedness of the corporation was without consideration and constituted a fictitious increase of its indebtedness, nevertheless $50,000 of that $135,000 indebtedness, so far as it constituted any increase of the indebtedness of the corporation, was a real and not a fictitious increase."

When the Southern Corporation gave its notes for $190,000 and pledged therewith an equal amount face value of its bonds it received cash and credit for that amount on its obligations under the lease from the Inter-Ocean Company, and we do not see how, in truth, it can be said that the transaction worked a fictitious increase of the indebtedness of the Southern Corporation. The Kemmerer Case brought under consideration a provision of the Missouri constitution and a statute in aid thereof. They read thus:

"No corporation shall issue stock or bonds, except for money paid, labor done or property actually received, and all fictitious increase of stock or indebtedness shall be void." Const. Mo. art. 12, § 8.

"The stock or bonds of a corporation shall be issued only for money paid, labor done or money or property actually received." Rev. St. Mo. 1909, § 2981.

A substantial difference between the Oklahoma constitution and the constitution and statute of Missouri is obvious. In the former the prohibition is against the issuance of stock only except for money, labor done or property actually received to the amount of the par value thereof,—bonds are not mentioned in that connection; while the latter prohibits the issuance of stock or bonds' except for money paid, labor done or property actually received. It there appeared that the Furnace Company gave its note in settlement of a pre-existing and past-due indebtedness of $3,664.62, and with its note it pledged to the payee $4,000 of its mortgage bonds as security for payment of the note. The payee, under authority given it by the collateral agreement which was a part of the note, sold the bonds at private sale, bought them in and allowed a credit of $100 on the note and obtained a judgment on the note for the balance. When the mortgage was foreclosed which secured the bonds it presented both the judgment and the bonds for payment as liabilities of the mortgagor. This court, after considering cases which construed like statutory or constitutional provisions, said:

"We find the whole trend of authority supporting the proposition that there must be a present consideration, in order to satisfy the demands of such constitutional and statutory provisions as are here involved."

The issuance of the bonds and pledging them as security for payment of the note were held void transactions because no consideration therefor was presently received. They were given to secure an antecedent debt. That case was followed by the Mudge Case, supra, which involved like transactions in behalf of other creditors of the Blast Furnace Company, who held its bonds as collateral security. The same issue was reargued, and it was said:

"In Kemmerer v. St. Louis Blast Furnace Co., 212 F. 63, 128 C. C. A. 519, this court held that the pledge of the bonds of a Missouri corporation to secure an antecedent debt without the receipt by the corporation

of any consideration except the former consideration for the old debt and the extension of the time of payment of that debt was a violation of the provisions of the constitution and statutes of Missouri which rendered the bonds void."

It was insisted by counsel for appellants that the decision in the Kemmerer Case was erroneous. We again considered the questions presented and adhered to the conclusion reached in the Kemmerer Case. It was pointed out that the supreme court of Missouri, in several cases which were cited, had held that a corporation must receive for its stock when issued money, labor or property equal in value to the par value of the stock, and it was said:

"As the constitution and the statute condition the power of a corporation of Missouri to issue bonds in the same clause by the same limitations that condition its power to issue its stock, it is equally indispensable to its issue of valid bonds that they be issued only for money paid, labor done, or property actually received which is equal in value to the par value of the bonds."

And we expressed the belief "that when the question is presented the Supreme Court of Missouri will decide that bonds issued by a corporation of that state and pledged to secure its antecedent indebtedness without the receipt by the corporation of any valuable consideration for them except the consideration of the old debts and the extension of the time for their payment are issued in violation of section 8, art. 12, of the constitution of Missouri, and of section 2981, Revised Statutes of that state, and that there was no error in the decision of this question in Kemmerer's case."

The appellants in the Mudge Case were in the identical position of appellant in the Kemmerer Case. From none of them did the corporation receive money, labor or property or increase of its assets at the time it pledged its bonds. In each instance they were pledged for old debts, as was the case of Lyon v. Bleeg, 240 F. 405, 153 C. C. A. 331, where the prohibition of the constitution of South Dakota ran against stocks and bonds. In In re Progressive Wall Paper Corporation, supra, bonds of a corporation of New York had been pledged to secure an antecedent debt. A statute of that state reads thus:

"No corporation shall issue either stock or bonds except for money, labor done or property actually received for the use and lawful purposes of such corporation." Consol. Laws, c. 59, § 55.

After reviewing a number of cases under statute or constitutional provisions similar to that of New York the order of the referee in bankruptcy holding the bonds invalid and void in the hands of the payee of the note for which they were pledged was sustained, on the ground that the corporation had no power to issue its bonds for an antecedent debt. The courts uniformly hold that where bonds of a corporation are pledged to secure payment of an antecedent debt and constitution or statute prohibits the issuance of its bonds except for money, labor done or property actually received by the corporation, they are voidable in the hands of the pledgee and in the hands of those who may subsequently receive them with knowledge of the facts. But, as already seen, the Oklahoma constitution does not include bonds in its prohibition, it applies only to stock of the corporation that may be issued. See also William Firth Co. v. Loan & Trust Co., 122 F. 569, 59 C. C. A. 73; In re Waterloo Organ Co., 134 F. 341, 67 C. C. A. 255.

But counsel for appellants rely on the second clause of the constitutional provision, "All fictitious increase of stock or indebtedness shall be void," and they claim that what is said in the Kemmerer, Mudge and Lyon Cases, arguendo, is a ruling by this court that the pledging of the $190,000 bonds was a fictitious increase of the Southern's indebtedness. In each of these cases the constitution or statute prohibited the issuance of bonds as well as stock, except for money or property received, and in each the bonds that were issued were held void because issued as security for a pre-existing debt. The corporation received neither money nor other property for the bonds; but the Southern Corporation received from the payees of the notes when it delivered the bonds to them their full par value in funds or credits, its notes and bonds were held for one and the same debt, that debt was not fictitious and it has not been increased, as was attempted to be done in the Kemmerer and Mudge Cases. No case has been cited by counsel or found by us construing the clause relied on in support of appellants' position. The section names issuance of stock only in connection with fictitious increase of indebtedness. The increase of bonded indebtedness is covered and intended to be protected from abuse by the following and last sentence of the section, which says nothing of fictitious increase of indebtedness; and the supreme court of Oklahoma has held that "This provision of our constitution [first

sentence of section 39] was intended by its framers and the people who adopted it to prevent the issuance by corporations of 'watered or fictitiously paid up stock.'" Lee v. Cameron, 67 Okl. 80, 82, 169 P. 17, 19; Bentley v. Zelma Oil Co., 76 Okl. 116, 184 P. 131, 143. In Chilson v. Cavanagh, 61 Okl. 98, 100, 160 P. 601, 602 (L. R. A. 1918D, 1044), that court said:

"The manifest purpose of the framers of our constitution was to protect the public against the well known, deceitful, and fraudulent practice indulged by some corporations of issuing shares of capital stock without receiving the par value therefor either in money or its equivalent. Obviously it was intended by the section quoted to provide that a corporation should receive, and the shareholders to whom the same was issued should be bound for the full par value of its stock, thus making the assets of the corporation worth the face value of its shares of stock when issued."

See also Webster v. Webster Refining Co., 36 Okl. 168, 128 P. 261.

[6] In none of those cases, however, was that court called on to determine whether an issue and pledge of mortgage bonds might create a fictitious increase of indebtedness within the meaning of the section, and if so, what facts were necessary to its accomplishment. But the phraseology and make-up of the section, taken in connection with what the supreme court of Oklahoma has said in construing it, raises serious doubt at least whether fictitious increase of indebtedness is not intended by the section to be applied only to issuance of watered stock. To apply it to bonds brings it in conflict with the general rule that a corporation may use any of its property as security for its bona fide indebtedness. These considerations, and the fact that there is no equity in appellants' contention, leads us to the conclusion that the bonds were the valid obligations of the Southern Corporation in the hands of the payees of the notes, and that Brittingham should be subrogated to their rights. To deny his estate participation in distribution of the funds arising from sale of the mortgaged property is but to enrich the Southern Corporation at his expense to the benefit of its other creditors,—an inequitable result and not compelled by constitution or statute.

[7] It is also argued that the taking of the lease by the Southern and the agreement on its part to give its notes and pledge its bonds were not valid and binding on it because no record of a meeting of its board of directors authorizing those acts was shown to have been made. Ayers testified that he was not at the meeting in Chicago on December 30, 1920, but his testimony was so thoroughly contradicted and discredited by the testimony of others who attended that meeting that the trial court seems to have attached to his evidence no weight, and we think no other conclusion can be drawn than that he was there and participated in the meeting. He signed the lease as president. He also participated as an officer of the Southern in carrying out the understanding reached at that meeting by which the Southern should give its notes and pledge its bonds. There was testimony that he was actively in favor of the arrangement made for the lease. There was also testimony that it was arranged at this meeting with Brittingham that he would help the Southern borrow the necessary funds to operate the McCook plant and that the Southern bonds were to be given the lenders as security. All of the Southern's officers and members of its board of directors were there and all of its issued stock was represented, and all consented to the arrangements there made. The Inter-Ocean Company's board of directors made up its records after the meeting authorizing the giving of the lease, but the board of directors of the Southern failed to make a record authorizing its acceptance. It, however, did accept, took possession of and operated the leased plant. In doing so it gave its notes and pledged its bonds. The failure of its board to make a record, as it should have done, was not an indispensable requirement and did not render invalid and abortive all of these transactions. It was uniformly careless in that respect. Its officers had made contracts for the purchase of large quantities of crude oil to be accepted over a long period, and contracts for sale of the refined product for railway engine use, deliveries to be made over a long period. They were carried out, but there was no directors' record of authorization, all knew about them and participated in making them and executing them, as here. People's Bank v. National Bank, 101 U. S. 181, 25 L. Ed. 907; McCartney v. Clover Valley Land & Stock Co., 232 F. 697, 146 C. C. A. 623, 1 A. L. R. 1127. Appellants have failed to convince us that the court erred in making the order appealed from and it is affirmed.

[8] At the time a receiver was appointed for the Southern Oil Corporation (December, 1922) it was and for some years theretofore had been indebted in a large amount to the Badger Oil Company, a Texas cor-

poration, all of the stock in the last-named company being owned by Thomas E. Brittingham, Sr., and George L. Woodard, each holding a half. The seventh paragraph of the decree foreclosing the Southern's mortgage and ordering a sale of its property reads thus:

"That the Badger Oil Company have and recover of and from the Southern Oil Corporation the sum of $230,432.99, with interest at the rate of six per cent. per annum from November 26, 1923; that said judgment is not entitled to the security of said first mortgage bonds, or any security, preference or priority, and is adjudged and allowed as an unsecured claim."

From this the Badger Oil Company has appealed (case No. 6803), assigning as error that the court did not allow its claim as pledgee of $200,000 of the mortgage bonds of the Southern Corporation, and denied it a right as such pledgee to share in the proceeds of the foreclosure sale.

The indebtedness of the Southern to the Badger Company was carried in open account on the books of the two companies, made up of borrowed money and oil purchased, amounting to slightly more than $200,000 in March, 1922, and it remained unpaid when the receivership came on. In May, 1921, George L. Woodard, R. S. Ayers and E. R. Monfort, acting individually as owners of two-thirds of the issued stock of the Southern Corporation, entered into a written agreement with Kansas & Gulf Company, a Delaware corporation, also engaged in the oil business, by which it was agreed to merge the business of the Southern and the Kansas & Gulf under one management. For that purpose it was stipulated that the three individuals named should transfer to the Kansas & Gulf the 50 shares of stock which they controlled and owned in the Southern, being two-thirds of the issued stock of that company, and that in consideration therefor the Kansas & Gulf would issue to them 4,000 shares of Kansas & Gulf stock for each share of the Southern. Thomas E. Brittingham, Sr., who held the remaining 25 shares of the issued stock in the Southern in trust, was not a party to this agreement, but Ayers, Woodard and Monfort transferred their stock in the Southern to the Kansas & Gulf and it issued to them respectively stock in it as provided in the contract. That contract also bound the Kansas & Gulf to an assumption of the indebtedness of the Southern in the proportion of the stock which it took over. Later Brittingham transferred the 25 shares which he held in trust for members of his family to the Kansas & Gulf and received therefor stock in it on the same basis of exchange which had been given to Woodard et al. In June, 1921, the capital stock of the Southern was increased to $3,000,000, part common and part preferred, and three members were added to its board of directors who represented the Kansas & Gulf.

This situation between the Southern and the Kansas & Gulf continued until March 10, 1922, whereupon Ayers, Woodard and Monfort entered into another contract with the Kansas & Gulf terminating and rescinding the contract of May, 1921, wherein it was agreed that the three individuals named would transfer their shares in the Kansas & Gulf back to that company, and in consideration thereof that company would give back to them the proportionate interests in the stock of the Southern formerly held by them. Brittingham was not a party to this contract. The transfers agreed upon were made. The Southern was indebted to the Kansas & Gulf, and it was further provided in the contract of March 10th that the Kansas & Gulf would and did fully release and discharge the Southern from its indebtedness to it, which then amounted to about $840,000. Woodard and Ayers were anxious that Brittingham should also re-exchange his stock in the Kansas & Gulf for Southern stock as they had done, and on March 24, 1922, they and Monfort met Brittingham at Chicago to consider the matter. If he would do so, then he, as trustee for members of his family, and Ayers and Woodard individually would again hold all of the Southern's issued stock, each one-third. Brittingham was not then an officer or director in the Southern and he declined to make the exchange unless the Southern would secure payment of its debt of more than $200,000 to the Badger Company, of which company he was president and owner of half of its stock. Woodard was then an officer and director in both companies, owning one-third of the Southern's issued stock and half of that of the Badger. He testified that he was opposed to giving the security requested by Brittingham because he wanted to use the Southern's credit and liquid assets for immediate company purposes, and that Ayers agreed with him. Ayers was president of the Southern but was not interested in the Badger Company, and Monfort had no real interest in either. In explanation of Woodard's attitude at the meeting and his claim that he did not intend that either company should be treated unfairly it should be said

that he soon thereafter tried to persuade Brittingham to release the Southern bonds which the meeting decided to pledge to the Badger Company so that they could be used to obtain funds for the Southern's operations, and in lieu thereof he would let the Badger Company hold title to 5,000 acres of valuable land in Texas owned individually by him. Upon Brittingham's insistence the result of the meeting was the execution of this agreement:

"Southern Oil Corporation.
"Petroleum and Its Products.
"Refineries:
"Yale, Oklahoma.
"Walters, Okla.                    Chicago Office:
                                   "35 W. Jackson Blvd.
                                   "March 24, 1922.

"Mr. T. E. Brittingham, Madison, Wisconsin—Dear Sir: It is understood, in fact an agreement has been signed, by Mr. Woodard and myself, to the effect that you have control of the Badger Oil Co. and the disposition of its credit or cash at the present time.

"Now, the Southern Oil Corporation is indebted to the Badger Oil Company to the amount of over two hundred thousand ($200,000) dollars and we desire that this account rest with the Southern Oil Corporation, as long as you find it desirable for at least for one year, with that end in view, we offer, to secure that account, collateral in the form of $200,000.00 of first mortgage bonds that are now in existence, in the form of a mortgage on the Southern Oil Corporation properties. However, we have placed this $200,000.00 bond already as collateral with the Mercantile Trust Company of St. Louis, protecting a loan of $50,000.00. Therefore, we can only offer you, at the present time, this $200,000.00 of bonds as collateral to protect this loan of $200,000.00 and over of the Badger Oil Co. subject to first—our payment of $50,000.00 to the Mercantile Trust Company, and after that has been paid, then you may have the $200,000.00 as first collateral in favor of such loan—but until then, it will take the form of collateral subject, as said before, to this $50,000.00 loan to the Mercantile Trust Co.

"Is this acceptable?
"Yours very truly,
"[Signed] R. S. Ayers, President.
"[Signed] Chas. R. Monfort, Secretary.
"[Seal.]
"Accepted: [Signed] T. E. Brittingham."

After this agreement was signed Brittingham made the exchange of his stock.

The debt to the Mercantile Trust Company of St. Louis mentioned in that agreement was reduced before receivership to $25,000, and the claim of the Badger Company rejected by the court was, that it was entitled to these bonds in secondary pledge and to have the proceeds of the foreclosure sale distributed thereon to it pro rata with other bonds, subject to the payment of the balance due Mercantile Trust Company.

It is obvious that Woodard was interested on both sides of the pledge agreement, and more so in behalf of the Badger Company than the Southern, if that transaction is to be considered independently of any other cause or reason that might have moved him to give assent. There were, we think, reasonable business considerations that dispel the idea that Woodard acquiesced in that agreement with the intentional design of favoring the Badger as against the Southern's other creditors, nevertheless that was its effect. Brittingham was still rated a rich man, and it would be to the interest of the Southern to have him directly interested in it again, possibly giving to it his personal credit and support. That also must have been the inducement to Ayers; we can see no other. The effect of the pledge would also be to the benefit of Brittingham, considering that transaction by itself, for it was made on the understanding that he would take back one-third of the Southern issued stock for shares which he held in the Kansas & Gulf, and that he immediately proceeded to do. Thereupon the status of Woodard and Brittingham was this: They as owners of the Badger would receive all of the benefits from the pledge, and as part owners of the Southern they would be charged with only two-thirds thereof, a net gain to them of $66,000 plus, if the bonds pledged were worth par. Conceding the right of the owners of the two corporations to make or cause them to make the contract, it was, however, a preference given by the Southern to one of its creditors, and in a substantial sense also a preference to a creditor who was officer and director in both corporations; and upon this and the claim that the Southern was then insolvent beyond recovery it is contended that the pledge agreement should be avoided on the complaint of general creditors. We think the evidence establishes that the Southern was insolvent at the time the pledge was made.

As we noted in case No. 6802, it had suffered very heavy losses during the fifteen months ending March 31, 1922, amounting to more than $1,200,000. There is disagree-

ment between the witnesses as to the value of Southern assets at that time, but we think it clear that they were entirely insufficient in value to meet its liabilities, which in March, 1922, were around $1,500,000, exclusive of its mortgage debt. On March 24, 1922, creditors' suits against the Southern had been brought, some of them to enforce mechanic's or materialmen's liens, and some on attachments. They went to judgments, and later parts of the Southern's plant equipment was sold to satisfy those claims, which amounted to more than $100,000. Other creditors were pressing for payment. It could not then find the funds to carry on operations and meet its obligations, some long past due. It closed down one of its refineries in Oklahoma in March, 1922, the other was operated thereafter intermittently on small runs of oil far below its capacity, and in a practical business sense that refinery had been closed also before the pledge was made. Considering the character of its business and the magnitude of plant investment it could hardly be said to be a going concern. Its financial embarrassments had disabled it from further performance of its corporate duties. It could not go on without immediately obtaining funds to a large amount and its condition was such that it could not get them. There can be no doubt that its officers and directors had full knowledge and understanding of its situation. The pledge brought no relief, it was given to secure an old debt. Whether we consider Woodard's dual relation to the transaction and the advantage and benefit that he would obtain and derive from it or shut our eyes to those facts, it seems clear that the conclusion of the court below that the pledge contract should be avoided was the correct one. For in Wyman v. Bowman, 127 F. 257, 274, 275, 276, 62 C. C. A. 189, 206, we held:

"But contracts and transactions between individuals and corporations of which they are directors or officers, which are unfair, in which the individuals have secured an undue or unjust advantage, in which an antagonism between the interest of the individuals' and the duty of the officials has resulted in the triumph of the former, are voidable at the option of the corporation, its creditors or stockholders."

And:

"The ground on which preferences given by corporations are held to be voidable is that when a corporation becomes insolvent, and its officers are, or ought to be, aware that it must soon cease to operate as a going concern, its assets become a trust fund, sacredly pledged, subject only to prior liens, to be equally distributed, first among its creditors, and then among its stockholders. But this trust does not attach until the corporation becomes insolvent. Nay, more, it does not so attach as to avoid preferences given in good faith until its officers become aware, or by the exercise of reasonable prudence and diligence would have become aware, that the continued operation of the company as a going concern for any considerable length of time is probably impracticable, and that it must soon close its business, cease its active existence, and distribute its property among its creditors."

[9] In Stuart v. Larson (C. C. A.) 298 F. 223, we had occasion to consider a preference given by a corporation to its directors as its creditors when they knew that it was insolvent and could not continue in business. The authorities are reviewed at length. It is the general rule that when corporations cannot continue in the discharge of their corporate functions because of insolvency, preferences which they may give to any of their creditors are voidable. The directors, because of those conditions, are put in a fiduciary relation toward corporate creditors and they must apply its assets so as to treat them all alike. Fletcher Cyc. Corpns., vol. VIII, §§ 5145–5154; Cook on Corporations (8th Ed.) vol. III, §§ 658, 692; Union Coal Co. v. Wooley, 54 Okl. 391, 154 P. 63, 19 A. L. R. 312.

[10] Insolvency alone does not place the directors of a corporation in the position of trustees of its property for the benefit of all of its creditors. American Exchange Nat. Bank v. Ward, 111 F. 782, 49 C. C. A. 611, 55 L. R. A. 356; Brittain v. Burnham, 9 Okl. 522, 60 P. 241; Union Trust Co. v. Hendrickson, 69 Okl. 277, 172 P. 440. There may be reasonable hope that it can be made solvent, and to that end it may enter into all appropriate contracts, including contracts of preference, while a going concern with fair prospects of rehabilitation. The trust relation does not arise until its financial condition has become such that there can be no reasonable expectation of permanent future betterment; but if it be apparent to its officers and directors that its condition is such that it cannot continue in the discharge of its corporate purposes and its activities as such must cease because of its financial embarrassments and insolvency, then equity imposes the trust relation with its duties and obligations, and all creditors of the same class must be treated alike. This, we think, was the condition of the Southern,

well known to all of its directors and officers on May 24, 1922, when it undertook to give to the Badger Company an advantage over its other creditors; and the decree avoiding that transaction is

Affirmed.